# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DRAFTKINGS, INC., CROWN PA GAMING LLC, AND GOLDEN NUGGET ONLINE GAMING LLC ,** | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| **THE CITY OF PHILADELPHIA ,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, DraftKings, Inc., Crown PA Gaming LLC, and Golden Nugget Online Gaming LLC (collectively "DraftKings"), by and through its undersigned counsel, hereby brings this action against Defendant, the City of Philadelphia (the "City"), and in support thereof, avers as follows:

## PRELIMINARY STATEMENT

1.      This action challenges the validity and enforceability of the Philadelphia Consumer Protection Ordinance, Phila. Code §§ 9-6301 *et seq.* (the "PCPO"), which the City enacted in 2024 to create a municipal consumer-protection enforcement regime separate from the statewide framework established by the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq*. DraftKings seeks declarations that the PCPO (i) conflicts with and is preempted by the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), (ii) exceeds the City's authority under the First Class City Home Rule Act, and (iii) is independently preempted and unenforceable as applied to DraftKings' licensed gaming activities under the Pennsylvania Race Horse Development and Gaming Act.

017373.0074 4909-0907-8204.10                                   1

2.      The City's mayor signed the PCPO into law in June 2024, acknowledging that it "specifically targets deceptive business practices including misleading financing plans, false advertising of product conditions, and other activities which are deemed illegal under existing Pennsylvania consumer protection laws," but deeming it necessary because of the "absence of a specialized local mechanism within the mayor's chain of command."[1] The City later amended the PCPO to apply retroactively to conduct that would also constitute a violation of the UTPCPL. *See* Phila. Code § 9-6307.

3.      The PCPO is preempted by and conflicts with the UTPCPL because it copies the UTPCPL's core prohibition on—and nearly all of its enumerated standards for—unfair or deceptive practices, while supplementing and altering the General Assembly's statewide enforcement regime with a municipal enforcement regime administered by the City Law Department.

4.      The UTPCPL defines prohibited conduct, identifies who may enforce Pennsylvania consumer protection law in the public interest, prescribes the procedures for public and private enforcement, and establishes the remedies and penalties available for violations.

5.      The General Assembly vested public enforcement authority under the UTPCPL in the Attorney General and district attorneys acting in the name of the Commonwealth. It did not authorize municipalities to create parallel consumer protection enforcement regimes.

6.      Nevertheless, through the PCPO, the City purported to create a municipal consumer protection enforcement scheme regulating the same subject matter as the UTPCPL while altering who may enforce the law, in whose name enforcement actions may be brought, how violations are calculated, and what remedies and penalties are available.

---

[1] https://www.phila.gov/2024-06-05-mayor-parker-signs-philadelphia-consumer-protection-ordinance/

7.    The First Class City Home Rule Act (the "Act") prohibits the City from exercising powers contrary to, in limitation of, or in enlargement of, the powers granted by statutes applicable throughout the Commonwealth.

8.    The City has already begun an investigation into DraftKings under the PCPO. The City's investigation is evidenced by, among other things, an April 24, 2026 document subpoena issued under the PCPO (the "Subpoena"). The Subpoena expressly states that the City is investigating DraftKings, that its purpose is to gather facts to determine whether DraftKings violated the PCPO, and that information obtained may be used in an enforcement action against DraftKings. A true and correct copy of the Subpoena is attached as Exhibit A.

9.    The City's invocation of the PCPO against DraftKings separately intrudes into Pennsylvania's comprehensive gaming regulatory framework. DraftKings' licensed gaming activities are regulated by the PGCB, which possesses general and sole statewide regulatory authority over the conduct of gaming and related activities under the Gaming Act.

10.    Unless restrained, the City will continue to assert authority under the PCPO to regulate DraftKings' ongoing licensed gaming activities, and to initiate or maintain a civil enforcement action under the PCPO targeting those activities.

11.    DraftKings therefore seeks a declaratory judgment that the PCPO is preempted, invalid, and unenforceable facially and as applied to DraftKings' licensed gaming activities, and injunctive relief prohibiting the City from initiating, maintaining, or pursuing a civil enforcement action under the PCPO against DraftKings based on those activities.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and this action is between citizens of different States.

13.    This Court has personal jurisdiction over the City because the City is in this District and the conduct challenged in this action occurred in this District.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the City is in Philadelphia, Pennsylvania, and a substantial part of the events giving rise to this action occurred in this District. The City enacted the PCPO in Philadelphia, has invoked the PCPO against DraftKings from Philadelphia, and has threatened a civil enforcement action under the PCPO based on DraftKings' ongoing licensed gaming activities.

## THE PARTIES

15.    Plaintiff DraftKings Inc. is a corporation organized under the laws of Nevada, and whose principal place of business is in Massachusetts.

16.    Plaintiff Crown PA Gaming LLC is a limited liability company formed under the laws of Nevada whose principal place of business is in Massachusetts, and whose sole member (Crown Gaming Inc.) is a Delaware corporation with its principal place of business in Massachusetts.

17.    Plaintiff Golden Nugget Online Gaming LLC ("Golden Nugget") is a limited liability company formed under the laws of Nevada whose principal place of business is in Massachusetts. Golden Nugget's sole member (LHGN HoldCo, LLC) is a Nevada limited liability company with its principal place of business in Massachusetts, whose sole member is likewise a Nevada limited liability company (Golden Nugget Online Gaming Holdings, LLC), whose sole

member is in turn a Nevada corporation (DraftKings Inc.) with its principal place of business in Massachusetts.

18.    The City is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal office located in Philadelphia, Pennsylvania.

## FACTUAL ALLEGATIONS

### A. The UTPCPL: The UTPCPL is a Comprehensive Statewide Scheme.

19.    The Pennsylvania General Assembly enacted the UTPCPL to establish a comprehensive statewide framework governing unfair methods of competition and unfair or deceptive acts or practices in trade or commerce. It is the Commonwealth's principal consumer protection statute.

20.    The UTPCPL defines prohibited conduct, authorizes the development of additional consumer protection standards through state rulemaking, prescribes available remedies, and establishes the mechanisms by which the statute may be enforced.

21.    The UTPCPL authorizes public enforcement only by the Attorney General and district attorneys acting in the name of the Commonwealth.

22.    The UTPCPL also authorizes a limited private right of action for qualifying persons who suffer an ascertainable loss as a result of conduct prohibited by the statute.

23.    By identifying the Attorney General and district attorneys as the public enforcers of the UTPCPL, and by omitting municipalities from that enforcement structure, the General Assembly centralized public consumer protection enforcement at the statewide level. Municipalities were deliberately omitted from that enforcement structure.[2]

---

[2] Notably, during legislative consideration of the UTPCPL, a proposal to authorize county and municipal solicitors to pursue public consumer protection enforcement actions was considered but not enacted. Instead, the General Assembly vested public enforcement authority in the Attorney General and district attorneys and has never extended that authority to municipalities. *See* Pa. Sen. Journal, 159th Gen. Assemb., Reg. Sess., at 1797–98 (1975).

24. Through the integrated statutory framework, the General Assembly established a uniform statewide system governing consumer protection standards, enforcement authority, and remedies.

**B. The PCPO Conflicts with the UTPCPL's Enforcement and Remedial Scheme and Is Preempted Under Conflict-Preemption Principles.**

25. In 2024, the City enacted the PCPO, codified at Phila. Code § 9-6301 *et seq*.

26. The PCPO substantially mirrors and regulates the same subject matter regulated by the UTPCPL. The UTPCPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," *see* 73 P.S. § 201-3(a), while the PCPO likewise makes it unlawful to engage in "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce directly or indirectly impacting one or more individuals in the City," *see* Phila. Code § 9-6302(1). The PCPO also copies nearly all of the UTPCPL's enumerated examples of "[u]nfair methods of competition" and "unfair or deceptive acts or practices," in many instances nearly verbatim. *Compare* Phila. Code § 9-6301(1)(d)(.1)-(.19), (.22), *with* 73 P.S. § 201-2(4)(i)-(xix), (xxi).

27. Unlike the UTPCPL, however, the PCPO authorizes enforcement actions in the name of the City. That difference creates a direct conflict with the UTPCPL's enforcement scheme, under which public enforcement actions are brought by the Attorney General or a district attorney in the name of the Commonwealth, not by municipalities in their own names.

28. The PCPO also establishes remedies, penalties, and enforcement mechanisms that differ from those created by the General Assembly. Among other things, the PCPO permits the City to seek monetary recovery, restitution, attorneys' fees, costs, and civil penalties under standards different from those prescribed by the UTPCPL.

29. The PCPO further expands potential liability by treating each statement, omission, communication, or publication period as a separate violation for penalty purposes, while doubling the per-violation penalty and eliminating the "willfulness" safeguard.

30. The PCPO limits and alters the UTPCPL's remedial scheme by creating different penalties, different recipients of monetary recovery, different standards for calculating violations, and different enforcement procedures. It also reaches conduct that directly or indirectly affects persons in the City and authorizes recovery for "any person aggrieved," regardless of that person's location or connection to Philadelphia.

31. The ordinance also authorizes retroactive recovery for pre-enactment conduct that would have violated the UTPCPL, thereby allowing the City to convert alleged UTPCPL violations into municipal PCPO violations and to seek municipal remedies for conduct the General Assembly placed within the UTPCPL's statewide enforcement framework.

32. These differences create conflict preemption. The PCPO regulates the same subject matter as the UTPCPL, but establishes a materially different municipal enforcement and remedial scheme. By reallocating enforcement authority, altering the penalties and remedies available for deceptive practices, and expanding potential liability beyond that authorized by the General Assembly, the PCPO stands as an obstacle to the statewide statutory framework established in the UTPCPL. Accordingly, the PCPO is preempted under Pennsylvania conflict-preemption principles.

33. DraftKings' claims arise from the City's attempt to exercise authority under the PCPO notwithstanding these conflicts, including by invoking a municipal enforcement and remedial scheme that conflicts with and enlarges the statewide enforcement and remedial scheme established by the UTPCPL.

**C. The First Class City Home Rule Act: The City Lacked Authority Under the First Class City Home Rule Act to Enact the PCPO.**

34.    The Pennsylvania statute under which the City adopted and exercises home-rule authority, the First Class City Home Rule Act (the "Act"), provides that "no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are … applicable in every part of the Commonwealth." *See* 53 P.S. § 13133(b).

35.    The UTPCPL is an act of the General Assembly applicable throughout the Commonwealth.

36.    The First Class City Home Rule Act defines and limits the City's legislative authority. Under the Act, the City may not exercise powers contrary to, or in limitation or enlargement of, powers granted by statutes applicable throughout the Commonwealth. Because the City exceeded those statutory limitations on its legislative authority by enacting the PCPO, the City lacked authority to enact the ordinance, and the PCPO is invalid.

37.    In changing who may enforce the law, how remedies are imposed, how violations are calculated, and how far the ordinance reaches, the City exceeded the legislative authority granted to it under the First Class City Home Rule Act by enacting the PCPO.

**D. An Actual Controversy Exists Concerning the Validity of the PCPO.**

38.    The City has enacted the PCPO, asserts that it is valid and enforceable, and has invoked it against DraftKings. DraftKings contends that the PCPO is preempted, invalid, and unenforceable.

39.    On July 9, 2026, counsel for DraftKings met and conferred with counsel for the City. During that meet-and-confer, the City confirmed that it is proceeding under the PCPO and intends to continue invoking the ordinance against DraftKings.

40. The City's enactment of the PCPO, its invocation of the PCPO against DraftKings, its investigation of DraftKings for potential PCPO violations, its statement that information obtained in its investigation may be used in an enforcement action against DraftKings, and its indication that it is likely to bring a civil enforcement action under the PCPO establish a credible threat of PCPO enforcement against DraftKings.

41. Declaratory and injunctive relief are necessary to resolve this controversy, determine whether the PCPO is valid and enforceable or instead preempted, invalid, and unenforceable on its face.

**E. The Gaming Act: The Gaming Act Preempts the PCPO Under Field-Preemption Principles and, to the Extent Applicable, Express-Preemption Principles.**

42. Pennsylvania legalized and regulates gaming through the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101 *et seq.* (the "Gaming Act").

43. The Gaming Act is a "statute of statewide concern." *Pa. Gaming Control Bd. v. City Council of Phila.*, 928 A.2d 1255, 1258 (Pa. 2007) (citing 4 Pa.C.S. § 1102).

44. Through the Gaming Act, the General Assembly created the PGCB and vested it with "general and sole regulatory authority over the conduct of gaming or related activities as described in this part." 4 Pa.C.S. §§ 1201(a), 1202(a)(1).

45. The Gaming Act's "primary objective . . . to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1).

46. The Gaming Act was expanded through Act 42 of 2017 to authorize additional forms of lawful gambling, including "interactive gaming" and "sports wagering." *In re Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containing $525.00 in U.S.*

*Currency, and Seven Receipts,* Nos. 50 MAP 2024 & 2 EAP 2024, slip op. at 16 (Pa. June 15, 2026) ("*Three Devices*") (citing Act of October 30, 2017, P.L. 419, No. 42, § 25; 4 Pa.C.S. §§ 13B01–13B63, 13C01–13C71).

47.     Sports wagering in Pennsylvania is lawful only when conducted within the scope of a valid sports wagering certificate and in accordance with the Gaming Act and PGCB regulations. *See* 4 Pa.C.S. §§ 13C04, 13C11.

48.     The Gaming Act expressly authorizes sports wagering at specified locations and over the internet. *See* 4 Pa.C.S. § 13C21(a).

49.     The PGCB has promulgated a comprehensive regulatory scheme governing every aspect of licensed sports wagering operations, including: standards for operators, manufacturers, suppliers, gaming service providers, principals, and employees; testing and controls; accounting and internal controls; advertisements, promotions and tournaments; compulsive and problem gambling; and self-excluded persons. *See* 58 Pa. Code chs. 1401a–1411a.

50.     The Gaming Act gives the PGCB authority to issue, approve, renew, revoke, suspend, condition, and deny gaming licenses, certificates, permits, registrations, and other authorizations, including those pertaining to sports wagering and interactive gaming. *See* 4 Pa.C.S. §§ 1202, 1204, 1207.

51.     The Gaming Act further establishes a Bureau of Investigations and Enforcement (the "BIE"), which is responsible for investigating and reviewing all applicants and applications for a license, permit or registration, reviewing applications, investigating potential violations of the Gaming Act, and reviewing licensed entities to ensure compliance. *See* 4 Pa.C.S. § 1517(a.1).

52.     The Gaming Act also establishes the Office of Enforcement Counsel (the "OEC"), which acts as the prosecutor in noncriminal enforcement actions initiated by the BIE and advises

the BIE on licensing, background investigations, audits, inspections, and investigations of potential violations of the Gaming Act. *See* 4 Pa.C.S. § 1517(a.2).

53.    DraftKings operates online sports wagering and interactive gaming services in Pennsylvania—including the promotional, account-management, responsible-gaming, and user data practices integral to those services—pursuant to licenses, certificates, authorizations, and regulatory approvals issued by or under the supervision of the PGCB.

54.    DraftKings is subject to ongoing regulatory oversight, inspection, investigation, and enforcement by the PGCB, BIE, and OEC under the Gaming Act.

55.    Through the Gaming Act, the General Assembly vested the PGCB with general and sole regulatory authority over licensed gaming activities, thereby occupying the field of licensed gaming regulation. By invoking the PCPO to investigate DraftKings' licensed gaming activities and threatening a civil enforcement action under the PCPO based on those activities, the City impermissibly intrudes into a field the General Assembly reserved for statewide regulation by the PGCB.

56.    Alternatively, the Gaming Act expressly preempts the PCPO because the General Assembly vested the Pennsylvania Gaming Control Board with "general and sole regulatory authority over the conduct of gaming or related activities as described in this part." 4 Pa.C.S. § 1202(a)(1). By expressly reserving regulatory authority over gaming and related activities to the PGCB, the General Assembly foreclosed inconsistent municipal regulation of the same subject matter. Accordingly, to the extent the PCPO regulates conduct within the scope of the Gaming Act, it is independently invalid because it is expressly preempted.

**F. The City Has Invoked the PCPO Against DraftKings and Threatened PCPO Enforcement.**

57.     On or about April 24, 2026, the City invoked the PCPO against DraftKings by notifying DraftKings that it was investigating DraftKings under the PCPO and by issuing the Subpoena seeking documents and materials from DraftKings. *See* Ex. A.

58.     The Subpoena states that it was issued under the purported authority of the Philadelphia Home Rule Charter (§§ 4-400(d), 8-409) and the PCPO.

59.     The Subpoena states that its "principal purpose" is "to gather facts to determine whether any violations of the PCPO have occurred." *See* Ex. A.

60.     The Subpoena further states that, if the City determines that DraftKings "is engaging, has engaged, or is about to engage in conduct that violates the PCPO," information obtained through the City's investigation "may be used by the City in an enforcement action against DraftKings." *See* Ex. A.

61.     The Subpoena seeks information related to, among other things: (1) Philadelphia User Revenue and Wagering Metrics (Request Nos. 1-4, 15-16, 23-24); (2) User Data Collection and Targeting Practices (Request Nos. 5-6, 19-20); (3) Advertising, Marketing and Promotional Campaigns (Request Nos. 7, 13-14, 17-18); (4) Promotional Terms, Disclosures, and User Experience (Request Nos. 8-12); and (5) VIP Programs and High Value Users (Request Nos. 21-22). *Id.*

62.     The requested materials are not limited to conduct, transactions, or occurrences occurring in Philadelphia, and instead concern DraftKings' broader practices, policies, communications and records.

63.     Although the Subpoena references users or conduct within Philadelphia, its requests are not limited to Philadelphia-based transactions, communications, statements, or business practices.

64.    Instead, the Subpoena seeks information concerning DraftKings' broader operations, policies, communications, and records beyond the scope of any legitimate municipal inquiry. The Subpoena seeks documents concerning, for example, the operational, economic, promotional, and responsible-gaming aspects of DraftKings' statewide gaming business, all of which fall within the PGCB's regulatory purview.

65.    Through the Subpoena, the City seeks to exercise consumer protection investigative authority that the UTPCPL assigns to the Attorney General and district attorneys, not to the City.

66.    The PGCB, not the City, is the Commonwealth agency charged by the General Assembly with statewide regulatory and enforcement authority over the conduct of gaming and related activities regulated by the Gaming Act. See 4 Pa.C.S. §§ 1202(a)(1), 1517. That authority includes oversight of matters directly implicated by the City's PCPO investigation, including but not limited to: sports betting and interactive gaming operations, advertising and promotions, customer communications, internal controls, and responsible-gaming practices.

67.    As evidenced by the statements and document requests in the Subpoena, the City is applying the PCPO to DraftKings' ongoing licensed gaming operations and is investigating DraftKings for potential substantive PCPO violations.

68.    The PCPO is preempted by the UTPCPL and the Gaming Act, and therefore invalid and unenforceable facially and as applied to DraftKings' licensed gaming activities.

### G.  An Actual Controversy Exists Concerning the PCPO's Application to DraftKings

69.    DraftKings continues to operate licensed online sports wagering and interactive gaming services in Pennsylvania and intends to continue doing so in accordance with the Gaming Act and PGCB regulations.

70.     The City contends that the PCPO authorizes it to investigate DraftKings and to bring a civil enforcement action under the PCPO based on DraftKings' licensed gaming activities. DraftKings denies that the City has such authority because the PCPO is preempted, invalid, and unenforceable.

71.     On July 9, 2026, counsel for DraftKings met and conferred with counsel for the City. During that meet-and-confer, the City confirmed that it intends to invoke the PCPO against DraftKings and indicated that it is likely to bring a civil enforcement action under the PCPO against DraftKings for alleged substantive violations of the ordinance. As a result, DraftKings must presently operate under the threat that its ongoing licensed gaming activities are subject to municipal regulation and enforcement under the PCPO.

72.     The City's enactment of the PCPO, its invocation of the PCPO against DraftKings, its investigation of DraftKings for potential PCPO violations, its statement that information obtained in its investigation may be used in an enforcement action against DraftKings, and its indication that it is likely to bring a civil enforcement action under the PCPO establish a credible threat of PCPO enforcement against DraftKings.

73.     Declaratory and injunctive relief are necessary to resolve this controversy, determine whether the PCPO may lawfully be applied to DraftKings' licensed gaming activities, and prevent the City from initiating, maintaining, or pursuing a civil enforcement action under the PCPO based on those activities.

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF
### (The PCPO Is Invalid Because It Is Preempted by the UTPCPL)

74.     DraftKings incorporates by reference the preceding paragraphs as if fully set forth herein.

75. The City has invoked the PCPO against DraftKings and indicated that it is likely to bring a civil enforcement action under the PCPO against DraftKings for alleged substantive violations of the PCPO. Thus, DraftKings faces a credible threat that the City will initiate a civil enforcement action under the PCPO against DraftKings. An actual and justiciable controversy exists concerning whether the PCPO is preempted, invalid, and unenforceable.

76. The PCPO is legally invalid and unenforceable because it conflicts with and is preempted by the UTPCPL.

77. An actual and justiciable controversy exists concerning the validity of the PCPO and the City's authority to initiate, maintain, or pursue a civil enforcement action under the PCPO against DraftKings.

78. As set forth herein, the UTPCPL establishes a comprehensive statewide framework governing unfair and deceptive trade practices, including the conduct prohibited, the public officials authorized to enforce the statute, and the remedies available for violations.

79. The General Assembly vested public enforcement authority under the UTPCPL in the Attorney General and district attorneys and did not authorize municipalities to create parallel consumer protection enforcement regimes.

80. The PCPO regulates the same subject matter governed by the UTPCPL while altering enforcement authority, enforcement procedures, remedies, penalties, and regulatory oversight.

81. The PCPO therefore conflicts with, enlarges, and undermines the statewide framework established by the UTPCPL.

017373.0074 4909-0907-8204.10

15

82.     Because the City's asserted enforcement authority derives from the PCPO, the City lacks authority to initiate, maintain, or pursue a civil enforcement action under the PCPO if the PCPO is preempted or otherwise unenforceable.

83.     DraftKings is entitled to a declaration that the PCPO is preempted by the UTPCPL and that the PCPO is therefore invalid and unenforceable. DraftKings is further entitled to an injunction prohibiting the City from initiating, maintaining, or pursuing any investigation or civil enforcement action against DraftKings under the PCPO, including by seeking to enforce the Subpoena against DraftKings.

**COUNT II – DECLARATORY AND INJUNCTIVE RELIEF**
**(The PCPO Is Invalid Because the City Lacked Authority Under the First Class City Home Rule Act to Enact It)**

84.     DraftKings incorporates by reference the preceding paragraphs as if fully set forth herein.

85.     The City has invoked the PCPO against DraftKings and indicated that it is likely to bring a civil enforcement action under the PCPO against DraftKings for alleged substantive violations of the PCPO. Thus, DraftKings faces a credible threat that the City will initiate a civil enforcement action under the PCPO against DraftKings. An actual and justiciable controversy exists concerning whether the PCPO is invalid and unenforceable.

86.     The PCPO is legally invalid and unenforceable because the City lacked authority under the First Class City Home Rule Act to enact it.

87.     An actual and justiciable controversy exists concerning the validity of the PCPO and the City's authority to initiate, maintain, or pursue a civil enforcement action under the PCPO against DraftKings.

017373.0074 4909-0907-8204.10                    16

88.    The City lacked authority under the Act to enact the PCPO because the Act prohibits the City from exercising powers contrary to, in limitation of, or in enlargement of the powers granted by acts of the General Assembly applicable throughout the Commonwealth.

89.    Because the City's asserted enforcement authority derives from the PCPO, the City lacks authority to initiate, maintain, or pursue a civil enforcement action under the PCPO if the PCPO is unenforceable.

90.    DraftKings is entitled to a declaration that the City lacked authority under the First Class City Home Rule Act to enact the PCPO, and that the PCPO is therefore invalid and unenforceable. DraftKings is further entitled to an injunction prohibiting the City from initiating, maintaining, or pursuing any investigation or civil enforcement action against DraftKings under the PCPO, including by seeking to enforce the Subpoena against DraftKings.

**COUNT III – DECLARATORY AND INJUNCTIVE RELIEF**
**(The PCPO Is Preempted as Applied to DraftKings' Licensed Gaming Activities Under the Gaming Act: Field Preemption and, in the Alternative, Express Preemption)**

91.    DraftKings incorporates by reference the preceding paragraphs as if fully set forth herein.

92.    The City has invoked the PCPO against DraftKings and indicated that it is likely to bring a civil enforcement action under the PCPO against DraftKings for alleged substantive violations of the ordinance. Thus, DraftKings faces a credible threat that the City will initiate a civil enforcement action under the PCPO against DraftKings based on its ongoing licensed gaming activities, including its online sportsbook and casino. An actual and justiciable controversy exists concerning whether the PCPO is preempted, invalid, and unenforceable as applied to those activities.

93. Under Pennsylvania law, field preemption applies where a statute "proclaims a course of regulation and control which brooks no municipal intervention." *See Dep't of Licenses & Inspections v. Weber*, 147 A.2d 326, 327 (Pa. 1959).

94. For purposes of field preemption, the Gaming Act and its implementing regulations occupy the field of licensed gaming activities within the Commonwealth by vesting the PGCB with "general and sole regulatory authority over the conduct of gaming or related activities as described in this part" and by establishing the BIE to carry out the Gaming Act's investigative and enforcement functions. *See* 4 Pa.C.S. §§ 1202(a)(1), 1517.

95. Under this integrated regulatory and enforcement apparatus, the PGCB has authority to issue, approve, renew, revoke, suspend, condition, and deny gaming licenses, certificates, permits, registrations, and other authorizations; the BIE is responsible for investigating and reviewing all applicants and applications for a license, permit or registration, reviewing applications, investigating potential violations of the Gaming Act, and reviewing licensed entities to ensure compliance; and the OEC acts as the prosecutor in noncriminal enforcement actions initiated by the BIE and advises the BIE on licensing, background investigations, audits, inspections, and investigations of potential violations of the Gaming Act. *See* 4 Pa.C.S. §§ 1202, 1204, 1207, 1517(a.1)-(a.2).

96. In the alternative, to the extent the Gaming Act's grant of "general and sole regulatory authority" to the PGCB over "the conduct of gaming or related activities" is construed as an express exclusivity provision, the Gaming Act expressly preempts the PCPO as applied to DraftKings' licensed gaming activities. *See* 4 Pa.C.S. § 1202(a)(1). By granting "sole regulatory authority" to the PGCB over those activities, the General Assembly expressly foreclosed municipal regulation of the same conduct through the PCPO. Thus, the PCPO is expressly preempted to the

extent the City applies it to investigate, regulate, or impose liability on DraftKings based on sports wagering, interactive gaming, casino gaming, or other activities regulated by the Gaming Act and the PGCB.

97.    The Subpoena illustrates that any PCPO enforcement action against DraftKings would necessarily implicate DraftKings' licensed gaming activities regulated by the Gaming Act and the PGCB. The Subpoena seeks documents concerning advertising, promotions, VIP programs, responsible gaming, customer communications, wagering data, user analytics, and operational practices that are governed by the Gaming Act and PGCB regulations. The City has invoked the PCPO to conduct its own investigation into the manner in which DraftKings conducts PGCB-regulated gaming activities through its online sportsbook and casino, and any PCPO enforcement action against DraftKings based on such investigation would constitute an impermissible municipal intervention in a field occupied by the Gaming Act and, alternatively, in activities over which the PGCB has express "general and sole regulatory authority."

98.    To the extent the PCPO purports to authorize the City to investigate, regulate, or bring a civil enforcement action concerning the subjects encompassed by the City's PCPO investigation—including sports wagering, interactive gaming, casino gaming, promotional credits and bonus offers, advertising, marketing, customer communications, user-data analytics, account management, VIP programs, and responsible-gaming practices—the PCPO is preempted under Pennsylvania law, both under field-preemption principles and, in the alternative, under express-preemption principles, and is invalid and unenforceable as applied to DraftKings.

## PRAYER FOR RELIEF

**WHEREFORE,** DraftKings respectfully requests that the Court enter judgment in its favor and against the City as follows:

(1) Declaring that the PCPO is invalid because (a) it is preempted under Pennsylvania conflict-preemption principles by the UTPCPL; (b) the City lacked authority under the First Class City Home Rule Act to enact it; and (c) it is preempted by the Pennsylvania Race Horse Development and Gaming Act by field preemption or in the alternative, by express preemption.

(2) Declaring that the City lacks authority to enforce the PCPO against DraftKings;

(3) Enjoining the City from initiating, maintaining, or pursuing any investigation or civil enforcement action arising pursuant to the PCPO against DraftKings based on DraftKings' licensed gaming activities, including but not limited to its online sportsbook and casino; and

(4) Granting DraftKings its costs and such other relief as this Court deems just and proper.

Dated: July 16, 2026

By:    /s/ *Michael J. Engle*
Michael J. Engle (PA ID 85576)
Stradley Ronon Stevens and Young, LLP
2005 Market Street
Philadelphia, PA 19103
T: 215-564-8000
F: 215-564-8120
E: mengle@stradley.com


Richard Patch (pro hac vice application forthcoming)
Clifford Yin (pro hac vice application forthcoming)
Coblentz Patch Duffy & Bass LLP
1 Montgomery Street, Suite 3000
San Francisco, CA 94104
T : 415-391-4800
F : 415-989-1663
E rpatch@coblentzlaw.com
cyin@coblentzlaw.com

017373.0074 4909-0907-8204.10                    20