# EXHIBIT A



# CITY OF PHILADELPHIA

**LAW DEPARTMENT**
One Parkway
1515 Arch Street
Philadelphia, PA 19102-1595

**Cherriel Gentles**
**Senior Attorney**
Cherriel.Gentles@phila.gov
(215) 683-9046

April 24th, 2026

**VIA ELECTRONIC MAIL**
Richard Patch, Esq.
Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104

    **Re:**    **In the Matter of DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC**

Dear Mr. Patch:

Enclosed please find a subpoena addressed to DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings"). The City of Philadelphia Law Department (the "City") issues this subpoena pursuant to its authority under the Philadelphia Home Rule Charter (§§ 4-400(d), 8-409) and the Philadelphia Consumer Protection Ordinance ("PCPO") (Phila. Code § 9-6303(1)) in connection with an investigation into potential PCPO violations.

DraftKings is required to produce all responsive materials by <u>May 24th, 2026</u>.

If you have any questions regarding this subpoena, please do not hesitate to contact me.

Sincerely,

Cherriel Gentles, Esq.
Senior Attorney (Consumer Protection)
Affirmative & Special Litigation Unit
City of Philadelphia Law Department
1515 Arch Street, 15th Fl.
Philadelphia, PA 19102
P: (215) 683-9046
Cherriel.Gentles@phila.gov

**SUBPOENA TO PRODUCE DOCUMENTS OR THINGS BY THE CITY OF PHILADELPHIA LAW DEPARMENT**

**In the Matter of DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC**

To:     DraftKings Custodian of Records

The City of Philadelphia Law Department (the "City") is investigating the affairs of DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings") pursuant to its authority under the Philadelphia Home Rule Charter (§§ 4-400(d), 8-409) and the Philadelphia Consumer Protection Ordinance ("PCPO") (Phila. Code § 9-6303(1)).

In furtherance of this investigation, DraftKings is required to produce all documents and materials responsive to the requests set forth in Attachment A to the City on or before <u>May 24th, 2026</u>.

Disclosure of information to the City is mandatory, subject only to the valid assertion of any applicable legal right or privilege DraftKings may have.

The City's principal purpose in soliciting the information is to gather facts to determine whether any violations of the PCPO have occurred (*see* Phila. Code §§ 9-6301 *et seq.*). If the City determines that DraftKings is engaging, has engaged, or is about to engage in conduct that violates the PCPO, the information obtained may be used by the City in an enforcement action against DraftKings. *See* Phila. Code § 9-6303(2).

The information supplied may be used for one or more of the following purposes:

1.      To disclose information to third parties during the course of the investigation to the extent necessary to obtain information pertinent to the investigation;

2.      To provide information or records to any appropriate governmental agency responsible for administering the law or for investigating, prosecuting, enforcing, or implementing any statute, rule, regulation, order, policy, or license;

3.      To disclose information, when appropriate, to a bar association or other trade or professional organization performing similar functions for possible disciplinary action; and

4.      To disclose records, in the event of litigation or an enforcement action, to the appropriate court, magistrate, or administrative tribunal, or to counsel or witnesses for purposes of discovery and the presentation of evidence, to the extent permitted by law.

If DraftKings fails to comply with the subpoena, the City may seek a court order compelling compliance. If such an order is issued and DraftKings thereafter fails to comply, DraftKings may be subject to civil or criminal sanctions, or both, for contempt of court.

By: _____

Cherriel Gentles, Esq.
Senior Attorney (Consumer Protection)
Affirmative & Special Litigation Unit
City of Philadelphia Law Department
1515 Arch Street, 15th Fl.
Philadelphia, PA 19102
P: (215) 683-9046
Cherriel.Gentles@phila.gov

**ATTACHMENT A**

Pursuant to its authority under the Philadelphia Home Rule Charter (§§ 4-400(d), 8-409) and the Philadelphia Consumer Protection Ordinance ("PCPO") (Phila. Code § 9-6303(1)), the City of Philadelphia Law Department (the "City") hereby serves the following requests for the production of documents or things on DraftKings, Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Online Gaming LLC (collectively "DraftKings").

**DEFINITIONS**

1.    "DraftKings," "You," or "Your" means DraftKings Inc., Crown PA Gaming Inc. d/b/a DraftKings, and Golden Nugget Gaming LLC, and any of their past or present parents, subsidiaries, affiliates, divisions, predecessors, successors, joint ventures, and related entities, as well as all of their respective officers, directors, employees, agents, contractors, consultants, and representatives and any person or entity acting for or on behalf of any of them.

2.    "Philadelphia" or "City of Philadelphia" means the City and County of Philadelphia, Pennsylvania.

3.    "Relevant Period" means January 1, 2023 through the present, unless otherwise specified in a particular Request.

4.    "Document(s)" or "document(s)" shall be construed in the broadest sense and includes, without limitation, all written, printed, typed, recorded, graphic, or electronic matter of any kind, whether draft or final, including but not limited to emails and attachments, messages, memoranda, letters, reports, word processing documents, presentations, spreadsheets, databases, logs, data tables, contracts, agreements, policies, procedures, manuals, guidelines, training materials, advertisements, marketing materials, scripts, code, specifications, wireframes, mockups, tickets, notes, audio and video recordings, images or graphics or photographs, calendars, and ESI

A-1

existing in any medium from which information can be obtained or translated into a reasonably usable form.

5.    "ESI" or "Electronically Stored Information" has the broadest meaning under applicable law and includes, without limitation, Documents and Communications in electronic form, application data, server data, cloud-stored data, hard drives, data contained on laptops or other portable devices, and data maintained in any information system, and any corresponding Metadata maintained with the underlying data contents.

6.    "Communication" means any transmission of information, whether written, electronic, oral, or recorded, including but not limited to emails and attachments, mobile phone text messages, instant messages, chat messages (including Slack, Teams, or similar platforms), letters, memoranda, presentations, calls, meetings, and voicemails.

7.    "User" means any person who created, maintained, accessed, or used a DraftKings account or DraftKings application, website, or services.

8.    "Philadelphia User" means any User who was physically located within the City of Philadelphia at the time of accessing DraftKings' services, placing a wager, receiving a promotion, or receiving a communication, and/or any User DraftKings identified, classified, or treated as located in Philadelphia.

9.    "Wager," "Bet," or "Wagering" means any bet, stake, or gaming transaction placed using DraftKings' sportsbook, casino, or related products or services.

10.    "Promotion," "Promotional Offer(s)," "Bonus Bet," or "Inducement" means any bonus, credit, free bet, odds boost, matched bet, promotional wager, incentive, or similar offer intended to encourage wagering, deposits, continued play, or engagement, including but not limited to a promotional program offered by DraftKings beginning in March 2023 that offered new

A-2

A-3

Users a sign-up bonus of up to $1,000 upon such Users creating an account on DraftKings' sports gambling platform, making an initial cash deposit, and satisfying certain requirements.

11.    "DK Dollars" means betting credits issued by DraftKings to Users for purposes of gambling on or through DraftKings' gambling platform.

12.    "Award" means any cash, betting credits (such as DK Dollars), prizes, and/or any other compensation offered by DraftKings to Users in connection with their participation in a Promotion.

13.    "Terms" means the requirements that a User must satisfy to qualify for a Promotion and obtain an Award.

14.    "VIP Program" or "VIP User" means any program, status, or designation (however named) that provides enhanced benefits, incentives, personalized service, or special treatment to selected users, including "high-value," "premium," or similar classifications.

15.    "Push Notification" means any notification, message, or alert sent to a User through a mobile application, browser, or device operating system, including in-app messages and similar real-time alerts.

16.    "Advertisement" or "Marketing Material" means any advertisement, promotion, solicitation, or marketing communication in any medium, including but not limited to mobile apps, websites, email, SMS, social media, television, radio, print, outdoor advertising, affiliate websites, splash pages, landing pages, and app store listings.

17.    "Geolocation Data" means any data, signal, attribute, or information used to determine or infer a User's physical location, including but not limited to GPS data, IP address, Wi-Fi triangulation, Bluetooth data, device identifiers, billing address, or similar information.

18.    "User Data" means any data, attribute, or information collected, stored, derived, inferred, or used by DraftKings concerning a User, including but not limited to identity, contact, demographic, financial, behavioral, wagering, engagement, device, and location data.

19.    "Algorithm," "Model," or "Scoring System" means any automated or semi-automated process, formula, rule set, or statistical or machine-learning model used to analyze User Data, predict behavior, segment users, target promotions, determine eligibility for offers or VIP status, or optimize engagement or revenue.

20.    "Responsible Gambling" means any policy, program, control, safeguard, or intervention intended to identify, prevent, mitigate, or respond to problem gambling, excessive gambling, or gambling-related harm.

21.    "Produce," "Producing," or "Production" means to provide true, complete, and legible copies of Documents or ESI in accordance with the Instructions for Production of Documents and ESI section of this Subpoena Attachment A and Appendix: Metadata Fields.

22.    "Identify" when used with respect to a Document or ESI means to state the type of document, its date, author(s), recipient(s), custodian, and a brief description of its subject matter.

23.    "Including" means including without limitation.

24.    "And" / "Or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

25.    "Native File(s)" means ESI in the file type for (or of) the application in which such ESI is normally crated, viewed and/or modified. Contrast with Static Image(s).

26.    "Static Image(s)" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer

A-5

systems. A Tagged Image File Format (TIFF) is an example of a Static Image. A Portable Document Format (PDF) file is another example of a Static Image.

27.    "Metadata" means: (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

28.    "OCR" means the optical character recognition file which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

29.    "Extracted Text" means the text extracted from a Native File and includes all header, footer, and document body information.

30.    A "Load/Unitization File" (often known as a .OPT file) is created and used by e-discovery review software and connection the location of a produce image in a production set to a bates number, and indicates where individual pages or files belong together as documents, including attachments and where each document begins and ends.

31.    A "Metadata File" (often in the form of a .DAT file) means a file created and used by e-discovery software, and which contains the Metadata relevant to each Static Image and Native File. See Appendix: Metadata Fields.

32.    The term "Discovery Material" shall mean any document, material, item, testimony, or thing filed with or presented to the Court as produced, served, exchanged, or generated during the discovery process.

**INSTRUCTIONS FOR PRODUCTION OF DOCUMENTS AND ESI**

1.    The Instructions for Production of Documents and ESI (the "Instructions") are intended to facilitate the collection, processing, and production of documents and information by DraftKings in the form of ESI. To the extent reasonably possible, the production of documents and ESI shall be conducted to maximize efficient and quick access to documents and minimize related discovery costs, and the Instructions shall be construed to ensure the prompt, efficient, and cost-effective production of documents and information by DraftKings.

2.    ESI shall be produced in the form specified in the Instructions. DraftKings may not reformat, scrub, or alter the ESI to intentionally downgrade the usability of the data.

3.    When processing ESI, Eastern Standard Time (i.e., EST or GMT-5) should be selected as the time zone. If another time zone is used, the Producing Party needs to specify the time zone in use according to the Metadata File fields listed in Appendix: Metadata Fields.

4.    Except for files produced as Native Files, DraftKings shall produce all ESI in single-page TIFFs, in Group IV black and white format. Alternatively, DraftKings may produce all ESI in text-searchable PDFs, in color, and as one PDF per file or Document. If producing ESI as PDFs, then an email attaching another file, for example, would be produced as two separate PDFs.

5.    DraftKings shall produce Load/Unitization Files and Metadata Files for each ESI production, including for any ESI production containing of Native Files. Each Metadata File shall include the fields listed in Appendix: Metadata Fields.

6.    DraftKings shall provide Extracted Text for all files that originated in electronic form. When no Extracted Text is available for a file that originated in electronic format, OCR text shall be provided unless the production of OCR text for such document is not technologically

feasible. Extracted or OCR text shall be provided for all documents that originated in hard copy, i.e., hard copy that was scanned for purposes of production. If producing images as PDFs, the PDFs shall be formatted to be text-searchable where text is present in the contents.

7. DraftKings shall provide Native Files for PPT, PPTX, XLS, XLSX, audio, video, photographs, databases, and any Document for which producing a Static Image alone would eliminate potentially relevant contents, information, or metadata. For any Document produced as a Native File, DraftKings shall also produce a placeholder image with a sequential Bates number that corresponds with the Native File.

8. When processing ESI for review and production in either a TIFF or PDF format, DraftKings will instruct its vendor, if possible, to include the following: hidden columns or rows, hidden text or worksheets, speaker notes and track changes (which include comments).

9. If DraftKings redacts all or any portion of a Document, those redactions shall be noted in the Metadata File.

10. If a document is redacted, DraftKings shall produce OCR text of the un-redacted portions of the document. No text from the redacted portion of the document should appear in the text file. Inadvertent failure to withhold OCR text from a redacted portion of a document by DraftKings shall not be deemed a waiver of any privilege associated with that document.

11. All documents must be stamped with a sequential Bates number on the lower right-hand corner of all images, using a prefix to identify the document was produced by DraftKings.

12. DraftKings will make reasonable efforts to de-duplicate ESI documents globally prior to production. However, for any de-duplication: (a) an email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical; and (b)

all Agreed Custodians who were in possession of a de-duplicated Document must be identified in the AllCustodians Metadata field specified in Appendix: Metadata Fields. To ensure accuracy, the AllCustodians Metadata field must be captured by an automated process and cannot be populated using a manual process.

13.    Email threads are email communications that contain prior or lesser-included email communications. A most inclusive email thread is one that contains all of the prior or lesser-included emails and attachments, including each branch of the email thread. DraftKings may use e-mail thread suppression to exclude lesser-included emails and attachments from production, provided however, that an email that includes an attachment or content in the BCC or other blind copy field shall not be treated as a lesser-included version of an email that does not include the attachment or content, even if all remaining content in the email is identical. To the extent that DraftKings uses email thread suppression to exclude email from production, DraftKings shall produce an Inclusive Metadata field specified in Appendix: Metadata Fields. The City expressly reserves the right to request that DraftKings shall log an entry for each lesser-included email in the thread, or that DraftKings shall log a single entry for the entire thread and produce a redacted version of the threaded email.

14.    DraftKings shall produce ESI via a download link provided to the City, or by delivery to the City of a removable USB flash drive. DraftKings shall identify the Bates range contained in the respective production.

15.    DraftKings shall produce slip sheets for files that cannot be produced and/or imaged because of technical issues ("Exception Files"), where such Exception Files are otherwise part of a family that contains one or more responsive, discoverable documents. The City may request that

DraftKings provide the file name, custodian and reason for any Exception File, which shall be provided within fourteen (14) days of DraftKings receiving such a request.

16. DraftKings shall promptly alert the City concerning any technical problems associated with complying with these Instructions. To the extent compliance with these Instructions imposes an undue burden with respect to any protocol, source, or search term, DraftKings shall promptly alert the City in an effort to resolve the issue.

17. DraftKings may object to production of ESI that is not reasonably accessible because of undue burden or cost. At the time of the objection, DraftKings will inform the City of the electronic information it is willing to produce, the nature and location of the information claimed to not be reasonably accessible, and the reason(s) why the requested production would impose an undue burden or is unreasonably costly, and afford the City ten (10) business days (calendar days minus weekends and state or federal holidays) to propose an alternative means of compliance with the request, including payment of all or part of the costs of retrieving the information.

18. Nothing in these Instructions shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product immunity, or any other applicable privilege or immunity.

19. Inadvertent production of documents that DraftKings believes in good faith are subject to a claim of attorney-client privilege or work-product immunity is not a waiver in the present action or in any federal or state proceeding. Unless previously waived, the inadvertent disclosure of any privileged information shall not be deemed a waiver of that privilege or immunity as to any other documents, testimony, or evidence. If the City finds information DraftKings produces or provides discovery that is subject to a claim of attorney-client privilege or work-

product immunity, the City will return to DraftKings all copies of such document and shall return or destroy all excerpts thereof within three (3) business days of finding the information. If DraftKings becomes aware that it may have provided information subject to the attorney-client privilege, it may give written notice to the City that the document is subject to a claim of attorney-client privilege or work product immunity and request that the document be returned to DraftKings. Upon receiving written notice, the City shall return to DraftKings all copies of such document and shall return or destroy all excerpts thereof within three (3) business days of receiving such written notice, provided that, if the attorney-client privileged or work product immunity is contested, a copy may be maintained by the City and provided to the Court for an in camera review for determination whether the designation is proper. The City will not review the contested discovery until the Court renders its ruling and will return or destroy the contested discovery if the Court rules that it is protected by either the attorney-client privilege or work product doctrine.

20.     DraftKings may propose reasonable document custodians ("Agreed Custodians"), search terms, and date parameters for the collection of ESI responsive to this Subpoena's Attachment A – Documents to Be Produced section. The mere fact that a document is hit or captured by the application of any agreed-upon search terms does not mean that such document is necessarily responsive or otherwise relevant to this Subpoena. Determinations of discoverability, responsiveness, and privilege shall be made by DraftKings. However, the City expressly reserves the right to challenge and object to determinations by DraftKings regarding discoverability, responsiveness, and privilege in accordance with the rights conferred under applicable Local Rules, and any rules and orders of this Court.

21.     If DraftKings withholds or redacts requested information or materials based upon the assertion of attorney-client privilege, work-product doctrine, or other applicable privilege(s),

A-10

DraftKings shall provide a privilege log describing each document or thing withheld or redacted in sufficient detail to reasonably permit the party seeking discovery to assess the validity of the privilege. This includes:

a. Unique identifying number, along with a separate column identifying the Bates number(s) of a document claimed to be privileged if produced in redacted form or produced as a Bates-stamped slip sheet.

b. The subject of the document, based on the Subject (or other similar category) from electronically generated Metadata associated with the document, to the extent applicable and reasonably available, except that a party may redact some or all of this information to the extent that it has a good faith belief that it would reveal privileged information.

c. The date of the document to the extent reasonably ascertainable.

d. The From (or Author), To, CC, and BCC information for the document based on electronically generated Metadata, to the extent applicable and reasonably available. For emails, the parties may identify this information based on the Metadata of the topmost (i.e., the most recent) email in the chain.

e. The specific privilege(s) asserted.

f. The basis for the privilege(s), including a description of the nature of the document in sufficient detail to reasonably permit the party seeking discovery to assess the validity of the privilege.

g. Indication (e.g., with an asterisk) of which individual(s) on the privilege log (authors, senders, and recipients) are attorneys or other legal personnel. If an attorney(s) or other legal personnel giving rise to the privilege is/are not within the Metadata of the most recent email, but otherwise appear on the face of the document or are apparent from context, the designating party will include the name(s) of any such individual(s) within the description or comparable field that identifies such legal nexus.

h. The name of or other identifying information as to the source of the document, (listing of the primary custodian constitutes sufficient identifying information).

A-11

## APPENDIX: METADATA FIELDS

| Field Name | Field Description | Document Type |
|---|---|---|
| SOURCE | Name of party producing the document | All |
| CUSTODIAN | Name of person from whose files document is produced | All |
| ALLCUSTODIANS | Names of all persons who possessed a duplicate of the document produced. | All |
| BEGBATES | Beginning Bates number (production number) | All |
| ENDBATES | End Bates number (production number) | All |
| BEGATTACH | First Bates number of attachment range | Email |
| ENDATTACH | Last Bates number of attachment range | Email |
| ATTACHCOUNT | Number of attachments to an email | Email |
| MD5 or SHA | Hash value for electronic documents | All |
| PAGECOUNT | Number of pages in the document | All |
| FILESIZE | File size | All |
| FILENAME | The native file name of an electronically collected document. | All |
| FILEEXTENSION | Such as .msg, .xlsx, .jpg, .docx, etc. | All |
| FILETYPE | Descriptive field loaded by the vendor (e.g. email, paper, edoc) | All |
| FILEPATH | File source path for all electronically collected documents, which includes file name, folder name, location and file source extension | All |
| NATIVEFILELINK | For documents provided in native format only. Used for the load file to connect an image or slipsheet with corresponding the produced native file. | All |

A-12

| | | |
|---|---|---|
| **HASREDACTIONS** | Indicator that redactions have been applied to a document image. | All |
| **FOLDER** | Name of the folder in which email was stored | Email |
| **FROM** | Sender | Email |
| **TO** | Recipient | Email |
| **CC** | Additional recipients | Email |
| **BCC** | Blind additional recipients | Email |
| **SUBJECT** | Subject line of email | Email |
| **DATESENT** | Date sent, in the format (mm/dd/yyyy) | Email |
| **TIMESENT** | Time sent | Email |
| **DATERCVD** | Date received | Email |
| **TIMERCVD** | Time received | Email |
| **INCLUSIVE** | Yes or No. Yes if other emails in the same thread group are not being produced because they only contain contents already produced by and INCLUSIVE=Yes email. Can be left blank for emails if a message does not belong to a thread group. | Email |
| **TITLE** | Title provided by user within the document | Electronic Document |
| **AUTHOR** | Creator of a document | Electronic Document |
| **DATECREATED** | Creation date, in the format (mm/dd/yyyy) | All |
| **TIMECREATED** | Creation time | All |
| **LASTMODIFIEDBY** | Person who has last modified a document | All |
| **DATELASTMOD** | Last modified date in the format (mm/dd/yyyy) | All |
| **TIMELASTMOD** | Last modified time | All |

A-13

A-14

| TIMEZONE | Time zone used for all date and time Metadata. Can be left blank for EST/GMT-5. Otherwise, specification required. | All |
|---|---|---|
| CONFIDENTIALITY | Confidentiality designation | All |

**DOCUMENTS TO BE PRODUCED**

1.    Produce documents sufficient to show, for each month from January 1, 2023 through the present, the total amount wagered with you by Philadelphia Users.

2.    Produce documents sufficient to show, for each month from January 1, 2023 through the present, the total gross gaming revenue you derived from Philadelphia Users.

3.    Produce documents sufficient to show, for each month from January 1, 2023 through the present, the number of unique Philadelphia Users who placed at least one Wager with you.

4.    Produce documents sufficient to show, for each month during the Relevant Period, your total handle, gross gaming revenue, and net revenue derived from Philadelphia Users.

5.    Produce documents identifying all categories of data and attributes you collected directly from users, received from third parties, or derived, inferred, predicted, or otherwise generated through analytics, algorithms, modeling, profiling, or other internal processes concerning individual users, including but not limited to behavioral, financial, demographic, and geolocation attributes.

6.    Produce documents sufficient to show how data collected from Philadelphia Users is used by you for targeted Advertisements, Bonus Bet offers, VIP Program qualification, and push notifications or other direct communications.

7.    Produce all Advertisements, promotions, bonus offers, and marketing materials you disseminated to Philadelphia Users.

8.    Produce all versions of terms and conditions, disclosures, and agreements you presented to Philadelphia Users concerning promotions, bonuses, wagering requirements, withdrawals, or account restrictions.

A-15

9. Produce documents sufficient to show how your wagering requirements, rollover requirements, withdrawal restrictions, or bonus conditions were disclosed to Philadelphia Users.

10. Produce documents sufficient to identify all splash pages, landing pages, app store previews, and in-app screens shown to Philadelphia Users when downloading or opening the DraftKings app.

11. Produce documents sufficient to identify any required user actions (including scrolling, clicking links, or checking boxes) necessary to view or accept bonus terms prior to depositing funds with you.

12. Produce all internal specifications, product requirements, or user experience design documents describing how and when you reveal disclosures to Philadelphia Users.

13. Produce documents sufficient to identify all advertising campaigns promoting bonus bets or wagering you targeted to Philadelphia Users or Philadelphia residents.

14. Produce documents sufficient to show the dates, duration, and estimated impressions of such advertisements within Philadelphia.

15. Produce documents sufficient to show, for each month from January 1, 2023 through the present, the number of Philadelphia Users who enrolled in or redeemed Bonus Bets or Promotional Offers placed with or through you.

16. Produce documents sufficient to show, for each month from January 1, 2023 through the present, the total dollar value of Bonus Bets you offered to Philadelphia Users and the total dollar value redeemed by Philadelphia Users.

17. Produce documents describing your strategy, objectives, and targeting criteria for bonus bet promotions directed to Philadelphia Users.

18.    Produce documents sufficient to show the internal metrics you used to evaluate the effectiveness of casino promotions, including analyses measuring the impact of promotional representations on user behavior, conversion rates, deposit frequency, or wagering volumes tied to specific promotions directed to Philadelphia Users.

19.    Produce documents describing the criteria you used to determine which Philadelphia Users receive push notifications, including any criteria based on wagering frequency, losses, or prior engagement.

20.    Produce documents sufficient to show the criteria you used to determine which Philadelphia Users receive specific Promotions, Bonus Bets, or Inducements.

21.    Produce documents sufficient to show the number of Philadelphia Users you designated as VIP or high-value during each year from 2023 to present and the criteria used to assign and maintain such status.

22.    Produce documents describing incentives, bonuses, credits, or personalized communications you offered to VIP Philadelphia Users.

23.    Produce documents sufficient to show the total amount wagered with you and lost by Philadelphia Users during the Relevant Period.

24.    Produce documents sufficient to show your profits and revenues derived from Philadelphia Users attributable to Promotions, Bonus Bets, VIP Programs, or targeted marketing.

A-17

## CERTIFICATE OF COMPLIANCE WITH SUBPOENA

I, _____, hereby certify and declare as follows:

1.      I am a duly authorized representative of DraftKings Inc. and/or its affiliated entities (collectively "DraftKings"), and I am authorized to make this certification on behalf of DraftKings.

2.      I have reviewed the Subpoena served upon DraftKings in this matter and understand the obligations imposed by it.

3.      DraftKings has conducted a diligent, good-faith, and reasonable search for documents, electronically stored information ("ESI"), and other materials responsive to the Subpoena, including searches of the files, records, databases, systems, and information sources reasonably likely to contain responsive materials.

4.      The searches described above included, as applicable, searches of electronic systems, databases, data warehouses, cloud storage, shared drives, email systems, messaging platforms, and other repositories used by DraftKings to store information responsive to the Subpoena.

5.      All documents, ESI, and materials in the possession, custody, or control of DraftKings that are responsive to the Subpoena and not subject to a claim of privilege or other protection have been produced.

6.      To the extent any responsive documents or ESI have been withheld, they have been withheld solely on the basis of a claim of privilege or other legally recognized protection, and such materials have been identified on a privilege log, so produced.

A-19

7.     The production includes all responsive documents and ESI located after a reasonable and diligent search, and no responsive documents or ESI have been intentionally withheld, concealed, destroyed, altered, or excluded from production.

8.     If any responsive documents or ESI are later discovered, DraftKings will promptly produce such materials in accordance with its continuing obligations under applicable law and the Subpoena.

This certification is made under penalty of perjury.

_____
Name:
Title:
*On behalf of DraftKings*

Executed on this ___ day of _____, 2026.

A-19