**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DRAFTKINGS, INC., CROWN PA GAMING LLC, AND GOLDEN NUGGET ONLINE GAMING LLC,** | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | **No. 2:26-CV-04953-JHS** |
| **v.** | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **Defendant.** | : | |

**DEFENDANT CITY OF PHILADELPHIA'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 8

II. BACKGROUND ........ 9

*A. Relevant Background Regarding Consumer Protection Law and the Ordinance* ........ *9*

*B. The City of Philadelphia's Subpoena to DraftKings* ........ *11*

*C. Procedural History* ........ *12*

III. LEGAL STANDARD ........ 12

IV. ARGUMENT ........ 13

*A. DraftKings' Complaint Should Be Dismissed for Lack of Jurisdiction Pursuant to Rule 12(b)(1).* ........ *13*

1. DraftKings Fails to Allege Facts Sufficient to Establish this Court's Subject Matter Jurisdiction. ........ 13

2. DraftKings' Claims Are Not Ripe and Should Be Dismissed. ........ 14

*B. Each of DraftKings' Claims Also Fail on the Merits and Should Be Dismissed Pursuant to Rule 12(b)(6).* ........ *20*

1. The City of Philadelphia Holds Clear Authority to Enact the Ordinance, Warranting Dismissal of Count II. ........ 20

2. The Ordinance Does Not Conflict with the UTPCPL, and Consequently is Not Preempted by That Statute ........ 23

3. The Gaming Law Does Not Occupy the Field of Deceptive Marketing and Its Express Preemption Provision Does Not Reach the Substantive Content of Advertisements or Promotions. ........ 26

a. The Gaming Act Does Not Occupy the Field of Unfair or Deceptive Practices. ........ 26

b. Part II of the Gaming Act Regulates a Narrow Area of Marketing, Targeting a Set of Player Protection Standards. ........ 29

c. The Gaming Act Expressly Preempts Limited, Specific Local Regulation and Does Not Broadly Preempt Local Regulation of Licensees' Sales and Marketing Activity. ...... 31

V. CONCLUSION ........ 33

## TABLE OF AUTHORITIES

Page(s)

Cases

*Armstrong World Indus., Inc. v. Adams*,
961 F.2d 405 .......... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 21

*Bender v. Williamsport Area Sch. Dist.*,
475 U.S. 534 (1986) .......... 5

*CBA Pharma, Inc. v. Perry*,
No. 22-5358, 2023 WL 129240 (6th Cir. Jan. 9, 2023) .......... 11

*Commonwealth by & through Krasner v. Att'y Gen.*,
309 A.3d 265 (Pa. Commw. Ct. 2024) .......... 17

*Commonwealth by Creamer v. Monumental Props., Inc.*,
329 A.2d 812 (Pa. 1974) .......... 2, 15

*Crawford v. Commonwealth*,
326 A.3d 850 (Pa. 2024) .......... 15

*Dep't of Licenses & Inspections v. Weber*,
147 A.2d 326 (Pa. 1959) .......... 20

*Devlin v. City of Phila.*,
862 A.2d 1234 (Pa. 2004) .......... 15

*Einhorn v. Phila. Elec. Co.*,
190 A.2d 569 (Pa. 1963) .......... 21

*Exxon Mobil Corp. v. Schneiderman*,
316 F. Supp. 3d 679 (S.D.N.Y. 2018) .......... 11, 12

*First Choice Women's Res. Ctrs. Inc. v. Davenport*,
608 U.S. ____, 146 S. Ct. 1114 (2026) .......... 8

*First Choice Women's Res. Ctrs., Inc. v. Platkin*,
No. 23-23076, 2024 WL 150096 (D.N.J. Jan. 12, 2024) .......... 8, 10, 11

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .......... 12

*GERS of Gov. of U.S. Virgin Islands v. Turnbull*,
134 F. App'x 498 (3d Cir. May 16, 2005) .......... 8, 9

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) .......... 11

*Gregg v. Ameriprise Fin., Inc.*,
245 A.3d 637 (Pa. 2021) .......... 2

*Hartman v. City of Allentown*,
880 A.2d 737 (Pa. Commw. Ct. 2005) .......... 18

*Heges v. United States*,
404 F.3d 744 (3d Cir. 2005) .......... 5, 6

*Hoffman Min. Co. v. Zoning Hearing Bd. of Adams Tp.*,
32 A.3d 587 (Pa. 2011) ........ 16
*Holt's Cigar*,
10 A.3d ........ 18
*Home Depot U.S.A., Inc. v. Jackson*,
587 U.S. 435 (2019) ........ 6, 7
*In re Corestates Tr. Fee Litig.*,
39 F.3d 61 (3d Cir. 1994) ........ 7
*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982) ........ 7
*Kokkonen v. Guardian Life Ins. Co of Am.*,
511 U.S. 375 (1994) ........ 7
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 10
*Mars Emergency Medical Srvs., Inc. v. Township of Adams*,
740 A.2d 193 (Pa. 1999) ........ 18, 22
*Mid-Atl. Sys. of WPA, Inc. v. Tax Office of Mun. of Monroeville*,
204 A.3d 579 (Pa. Commw. Ct. 2019) ........ 20
*Morse v. Lower Merion Sch. Dist.*,
132 F.3d 902 (3d Cir. 1997) ........ 6
*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
239 F.3d 333 (3d Cir. 2001) ........ 9, 10
*Nutter v. Dougherty*,
938 A.2d 401 (Pa. 2007) ........ 15, 20
*O'Keefe v. Chisholm*,
769 F.3d 936 (7th Cir. 2014) ........ 11
*Penn. Gaming Control Bd. v. City Council of Phila.*,
928 A.2d 1255 (Pa. 2007) ........ 15, 16, 24, 25
*Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs*,
580 F.3d 185 (3d Cir. 2009) ........ 10
*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017) ........ 6, 8, 9, 10
*PPL Elec. Utils. Corp. v. City of Lancaster*,
214 A.3d 639 (Pa. 2019) ........ 20
*Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*,
40 F.3d 1454 (3d Cir. 1994) ........ 8, 9
*Rose View Manor, Inc. v. City of Williamsport*,
630 A.2d 474 (Pa. Commw. Ct. 1993) ........ 20
*Smerling v. Harrah's Entertainment, Inc.*,
912 A.2d 168 (N.J. Super. Ct. App. Div. 2006) ........ 25
*Smith v. Wisconsin Dep't of Ag., Trade & Consumer Prot.*,
23 F.3d 1134 (7th Cir. 1994) ........ 9
*Spahn v. Zoning Bd. of Adjustment*,
977 A.2d 1132 (Pa. 2009) ........ 15
*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990) ........ 9

*Sunny Farms, Ltd. v. North Codorus Township*,
474 A.2d 56 (Pa. Commw. Ct. 1984) .......... 18
*Texas v. United States*,
523 U.S. 296 (1998) .......... 9, 10
*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148 (3d Cir. 1995) .......... 9, 10
*Warren v. City of Philadelphia*,
115 A.2d 218 (Pa. 1955) .......... 16, 18
*Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*,
894 F.3d 509 (3d Cir. 2018) .......... 8
*Western Pennsylvania Restaurant Association*,
77 A.2d .......... 18
*Wolfe v. Township of Salisbury*,
880 A.2d 62 (Pa. Commw. Ct. 2005) .......... 18

## Statutes

4 Pa. C.S. § 1102 .......... 24
4 Pa. C.S. § 1202(a)(1) .......... 21
4 Pa. C.S. §§ 13B52, 13C62, 1211 .......... 21, 24
4 Pa. C.S. §§ 1201, 1207, 13B41 .......... 21, 24
4 Pa. C.S. §§ 1509, 1516 .......... 21, 23
28 U.S.C. § 1332 .......... 7
28 U.S.C. § 1332(a)(1) .......... 6
43 P.S. §§ 951–963 .......... 18
53 P.S. § 13101 .......... 14
53 P.S. § 13131 .......... 3, 14
53 P.S. § 13133(b) .......... 14
73 P.S. § 201-4 .......... 3
Pa. Const. art. IX § 2 .......... 14
Phila. Code § 9-6301 .......... 5
Phila. Code § 9-6303 .......... 3, 4, 13

## Rules

Federal Rule of Civil Procedure 12(b)(1) .......... 5, 6, 8
Federal Rule of Civil Procedure 12(b)(6) .......... 6

## Regulations

58 Pa. Code § 812a.7 .......... 23
58 Pa. Code §§ 501a.5, 813a.1-5 .......... 23
58 Pa. Code §§ 501a.7, 813a.1 .......... 21
Admin. Code §§ 20-700 to 20 706 .......... 3

## Other Authorities

14A Wright & Miller, *Federal Practice and Procedure*, § 3708 at 143-44 (2d ed. 1985) ............ 7
*From Rancid to Reasonable: Unfair Methods of Competition Under State Little FTC Acts*, 73 Am. U. L. Rev. 857 (Feb. 2024) ............ 2

## I. INTRODUCTION

Plaintiff DraftKings has filed this premature complaint for declaratory and injunctive relief to prevent any municipal investigation into marketing of its product within Philadelphia's city limits. By filing this action, DraftKings seeks not only to prevent any local investigation of its advertising directed toward Philadelphia consumers but also to altogether upend the City's self-governance by asking this Court to bar the City from taking any action to protect its residents from unfair and deceptive business practices.

The Complaint's most glaring deficiency is that it is woefully premature. DraftKings, instead of simply responding to an administrative subpoena or negotiating in good faith with the City regarding its objections, has rushed to court to avoid even these initial steps in the investigation process. As the Complaint admits, the City has not moved to enforce the subpoena, nor has it yet made any determination as to whether DraftKings' marketing and promotion efforts to Philadelphia consumers violate the City's Consumer Protection Ordinance. Indeed, DraftKings' beeline to court was so hasty that it neglected to adequately plead an amount in controversy to establish federal jurisdiction. The lack of claimed monetary harm is unsurprising in this premature suit, where any future enforcement action is purely hypothetical. The Complaint's lack of a ripe controversy and failure to establish subject-matter jurisdiction both warrant dismissal under Rule 12(b)(1).

But DraftKings' claims suffer substantive defects atop their jurisdictional deficiencies. The City has clear authority under the First Class City Home Rule Act to enact local legislation that does not conflict with Commonwealth legislation. The City's Consumer Protection Ordinance is consistent with, and furthers the objectives of, both the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the Pennsylvania Race Horse Development and

Gaming Act. Not only does this consistency undermine DraftKings' contention that the City lacks authority to legislate in this space, but it also undermines DraftKings' claims that the City's Ordinance is preempted by either or both state laws. All three Counts of the Complaint, even if justiciable, are subject to dismissal under Rule 12(b)(6).

For any or all of these reasons, the City respectfully requests that this Court dismiss the Complaint in its entirety.

## II. BACKGROUND

### A. Relevant Background Regarding Consumer Protection Law and the Ordinance

In 1914, Congress enacted the Federal Trade Commission Act to prohibit unfair methods of competition. Pub. L. No. 63-203, 38 Stat. 717 (Sept. 26, 1914). By the 1960s, many states drafted their own consumer-protection statutes, commonly known as "Little FTC Acts." *See* Samuel Evan Milner, *From Rancid to Reasonable: Unfair Methods of Competition Under State Little FTC Acts*, 73 Am. U. L. Rev. 857 (Feb. 2024). Pennsylvania's version, the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), followed in 1968. The Pennsylvania Supreme Court has held that the UTPCPL was modeled on the FTC Act and the Lanham Act, and that Pennsylvania courts may look to decisions interpreting those federal statutes for guidance in construing it. *Commonwealth by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 817–18 (Pa. 1974); *see also Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 647, 649 (Pa. 2021) (adopting the FTC's capacity-to-deceive standard as the operative test under the UTPCPL's catch all provision because the General Assembly, having borrowed the FTC Act's language, must be presumed to have borrowed the body of federal interpretation that came with it).

Consistent with this body of federal and Commonwealth consumer protection law, the City enacted its Consumer Protection Ordinance ("Ordinance) in 2024. Compl., ¶ 25 (ECF No. 1). The Ordinance is incorporated into the Philadelphia Code at Chapter 9-6300.[1] As the Complaint acknowledges, the Ordinance "substantially mirrors" the UTPCPL and "copies nearly all of the UTPCPL's enumerated examples of 'unfair methods of competition' and 'unfair or deceptive acts or practices,' in many instances nearly verbatim." *Id.*, ¶ 26. Simply put, the UTCPCL and the Ordinance prohibit the same conduct.

The Ordinance's enforcement and remedy provisions reflect the fact that the Ordinance is a municipal law. While the UTPCPL grants the Pennsylvania Attorney General and county District Attorneys the authority to bring actions to enjoin violations of the UTPCPL in the name of the Commonwealth, 73 P.S. § 201-4, the Ordinance allows the City's Law Department to file actions in the name of the City against any person alleged to have violated the Ordinance, Phila. Code § 9-6303(2). In addition, the Ordinance provides for a civil penalty of $2,000 per violation, consistent with the Pennsylvania First Class City Home Rule Act, which provides that Philadelphia ordinances "shall be enforceable by the imposition of fines, forfeitures and penalties, not exceeding two thousand three hundred dollars ($2,300), and by imprisonment for a period not exceeding ninety days." 53 P.S. § 13131.

Philadelphia is not alone in enacting a local ordinance to complement nationwide and statewide consumer protection regimes. A number of other big cities have enacted similar ordinances in recent years. *See* N.Y.C. Admin. Code §§ 20-700 to 20 706 (New York City, enacted 2022); Balt., Md., City Code art. 2, § 13-102(b) (Baltimore, enacted 2023); MCC § 2-25-090 (Chicago, enacted 2008).

[1] Available at https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-306339.

**B. The City of Philadelphia's Subpoena to DraftKings**

The Complaint references and attaches a subpoena that the City issued to DraftKings on April 24, 2026 (the "Subpoena"). Compl., ¶¶ 57-68 & Ex. A (ECF Nos. 1, 1-3). The Subpoena states that the City, through its Law Department, is investigating DraftKings pursuant to the City's authority under the Philadelphia Home Rule Charter Sections 4-400(d) and 8-409 and Section 9-6303(1) of the Philadelphia Code. Subpoena at 1 (ECF No. 1-3). Section 4-400(d) of the Charter grants the City's Law Department the power to "investigate any violation or alleged violation within the City of the statutes of the Commonwealth of Pennsylvania or the ordinances of the City which may come to its notice." Charter § 4-400(d). Charter Section 8-409 provides that City departments that are authorized to conduct investigations have the power to issue subpoenas requiring the production of documents and evidence. *Id.* § 8-409. The Ordinance grants the City's Law Department the authority to investigate violations of the Ordinance, including through issuance of subpoenas. Phila. Code § 9-6303(1).

The Subpoena states that the City's *principal* purpose in issuing the Subpoena is to "gather facts to determine *whether* any violations of the PCPO have occurred." Subpoena at 1 (emphasis added). The Subpoena further states that "*[i]f* the City determines that DraftKings is engaging, has engaged, or is about to engage in conduct that violates the [Ordinance], the information obtained *may* be used by the City in an enforcement action against DraftKings." *Id.* (emphasis added). The Subpoena contains 24 requests for documents, the majority of which are limited in scope to documents and information relating to Philadelphia Users, a term defined in the subpoena. Subpoena A-2, A-15—A-17 (ECF No. 1-3).

On July 9, 2026, counsel for DraftKings and the City met briefly regarding the Subpoena. Compl., ¶ 71. A week later, DraftKings sued the City. Compl. (filed July 16, 2026). The City has not taken any steps to compel DraftKings' compliance with the subpoena, nor has the City initiated any enforcement action against DraftKings, whether under the Ordinance or any other applicable law. *Id.*, ¶¶ 57-73.

### C. Procedural History

DraftKings initiated this civil action on July 16, 2026, by filing a Complaint for Declaratory and Injunctive Relief. Compl. (ECF No. 1). The Complaint challenges the validity and enforceability of Philadelphia's Consumer Protection Ordinance, Phila. Code §§ 9-6301 *et seq.*, seeking a declaration that: (1) the Ordinance is preempted by the Pennsylvania Uniform Trade Practices and Consumer Protection Law; (2) the Ordinance is preempted by the Pennsylvania Race Horse Development and Gaming Act; (3) the City lacked authority under the Pennsylvania First Class City Home Rule Act to enact the Ordinance; and (4) the City lacks authority to enforce the Ordinance against DraftKings. Compl., Prayer for Relief at 19-20. The Complaint also seeks to enjoin the City from investigating DraftKings and from enforcing the Ordinance against DraftKings. *Id.*

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a court to dismiss a complaint for lack of a federal court's subject matter jurisdiction. It is axiomatic that the Court can adjudicate a dispute only if it has subject matter jurisdiction to hear the claims asserted. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). The plaintiff bears the burden of demonstrating that the Court has jurisdiction. *Heges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005); *see* Fed. R. Civ. P. 12(b)(1). In considering a 12(b)(1) motion, "the district court may not

presume the truthfulness of plaintiff's allegations, but rather must 'evaluat[e] for itself the merits of [the] jurisdictional claims.'" *Heges*, 404 F.3d at 750. A motion to dismiss for lack of standing or ripeness is also evaluated under Rule 12(b)(1). *See Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017) (discussing ripeness challenge under Rule 12(b)(1)).

Rule 12(b)(6) permits dismissal when a complaint fails "to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, a court should accept the truth of a complaint's factual allegations, but it should not credit a plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).

As discussed below, Plaintiff's Complaint for Declaratory and Injunctive relief fails as a matter of law under these well-established pleading standards and should be dismissed.

## IV. ARGUMENT

### A. DraftKings' Complaint Should Be Dismissed for Lack of Jurisdiction Pursuant to Rule 12(b)(1).

#### 1. DraftKings Fails to Allege Facts Sufficient to Establish this Court's Subject Matter Jurisdiction.

DraftKings invokes this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) but fails to allege any monetary harm at all. Because the Complaint fails to meet the minimum amount in controversy of $75,000, DraftKings has not established this Court's jurisdiction. Accordingly, this matter should be dismissed for lack of jurisdiction pursuant to Rule 12(b)(1).

Whether through alleged damages or the value of an injunction, the party invoking diversity jurisdiction must show that the dispute meets the minimum amount in controversy. The "[f]ederal courts are courts of limited jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, 587

U.S. 435, 437 (2019) (quoting *Kokkonen v. Guardian Life Ins. Co of Am.*, 511 U.S. 375, 377 (1994)). This Court's jurisdiction is "limited to those subjects encompassed within a statutory grant of jurisdiction." *Id.* (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982)). To invoke the Court's original jurisdiction in a diversity case, "the matter in controversy" must "exceed[] the sum or value of $75,000, exclusive of interest and costs . . . ." 28 U.S.C. § 1332. In "injunctive actions," such as this, the "amount in controversy is measured by the value of the right sought to be protected by the equitable relief." *In re Corestates Tr. Fee Litig.*, 39 F.3d 61, 65 (3d Cir. 1994) (citations omitted). "In other words, 'it is the value to plaintiff to conduct his business or personal affairs free from the activity sought to be enjoined that is the yardstick for measuring the amount in controversy.'" *Id.* (quoting 14A Wright & Miller, *Federal Practice and Procedure*, § 3708 at 143-44 (2d ed. 1985)).

Here, DraftKings makes no claim for damages, nor does it allege any facts regarding its purported costs to comply with the challenged Ordinance or subpoena. *See generally* Compl. DraftKings provides absolutely no basis to conclude that its suit meets the amount in controversy requirement, and it should be dismissed for lack of subject matter jurisdiction.

Indeed, DraftKings fails to plead the minimum amount in controversy because it cannot establish any harm at all at present—its pre-enforcement claims are not ripe, as discussed next.

**2. DraftKings' Claims Are Not Ripe and Should Be Dismissed**.

DraftKings' claims are not ripe. It seeks declaratory and injunctive relief on three different theories that the Ordinance is preempted and exceeds the City's Home Rule authority. But the City has not attempted to enforce its Ordinance against DraftKings. The City instead has begun an investigation by issuing a subpoena to DraftKings, but it has not yet sought to enforce that subpoena. The City has not determined that DraftKings violated any law, owes any fines or

penalties, or must do or refrain from doing anything at present. Rather than dispute any potential conclusion that DraftKings has misled its customers through unfair or deceptive marketing in violation of the law, DraftKings races to this Court to prohibit any investigation into its activities in Philadelphia at all. There is no ripe controversy to adjudicate, and the matter should be dismissed pursuant to Rule 12(b)(1).

The doctrine of ripeness requires a suit to raise a sufficiently concrete dispute, not one that depends on hypothetical future events that may never occur. "The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 522 (3d Cir. 2018). It is one of "several justiciability doctrines that cluster about Article III . . . including 'standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions.'" *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 23-23076, 2024 WL 150096, *2 (D.N.J. Jan. 12, 2024) (quoting *Plains*, 866 F.3d at 539), *rev'd on other grounds sub nom. First Choice Women's Res. Ctrs. Inc. v. Davenport*, 608 U.S. ____, 146 S. Ct. 1114 (2026) (finding plaintiff established standing—and thus ripeness and subject-matter jurisdiction—by asserting injury to its First Amendment associational rights). Related to standing, "ripeness [determines] when a proper party may bring an action" while "standing [determines] who may bring the action." *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) (citing *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 & nn. 12-13 (3d Cir. 1992)). The doctrine allows courts to avoid deciding issues that rest "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *GERS of Gov. of U.S. Virgin Islands v. Turnbull*,

134 F. App'x 498, 500 (3d Cir. May 16, 2005) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). When "any injury that may occur in the future is speculative, it would be improper for [the Court] to resolve the merits of the case . . . ." *Id.* at 501. "[I]t is of course true that if no injury has occurred, the plaintiff can be told either that *she* cannot sue, or that she cannot sue *yet*." *Presbytery*, 40 F.3d at 1462 (quoting *Smith v. Wisconsin Dep't of Ag., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994)).

The *Step-Saver* test guides the Court's analysis of claims for declaratory judgments and injunctive relief to determine if they are ripe. *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643 (3d Cir. 1990). The three-part test for ripeness examines: "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Plains*, 866 F.3d at 540 (citation omitted). *See also id.* (explaining that the court "consider[s] related claims for declaratory and injunctive relief under the same *Step-Saver* test" (citing *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 339-49 (3d Cir. 2001)).

Adversity is lacking when an alleged injury depends on a chain of contingencies that may not occur. The "[p]arties' interests are adverse where harm will result if the declaratory judgment is not entered." *Id.* at 541 (quoting *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995)). But when "the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Id.* (citation omitted). In cases involving government enforcement, the "party seeking review" must demonstrate a "substantial threat of real harm" that "remain[s] real and immediate throughout the course of the litigation." *Id.* (citation omitted). Where harm would only result to the plaintiff after a chain of contingencies, the claims "lack both sufficient

adversity for ripeness and a cognizable Article III injury." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) & *Texas v. United States*, 523 U.S. 296, 300 (1998)).

The second prong of the *Step-Saver* test is whether the judgment would be conclusive. That is, whether "'the legal status of the parties' will 'be changed or clarified,'" *Plains*, 866 F.3d at 543 (quoting *Travelers*, 72 F.3d at 1155), and "'whether further factual development . . . would facilitate decision' or," instead, "the question presented is predominantly legal," *id.* (quoting *NE Hub*, 239 F.3d at 344).

The third and final prong of *Step-Saver* is practical utility. This prong inquires "whether the parties' plans of actions are likely to be affected by a declaratory judgment . . . and considers the hardship to the parties of withholding judgment." *Id.* at 543-44 (quoting *NE Hub*, 239 F.3d at 344-45). Where, as here, no action is required or prohibited or no harm has occurred or will imminently occur, and the plaintiff "would take the same steps whether or not it was granted a declaratory judgment," practical utility is not satisfied. *Id.* at 544 (quoting *Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs*, 580 F.3d 185, 192 (3d Cir. 2009)). Even where "a declaratory judgment might spare [a plaintiff] from a costly audit, a judgment before [the defendant] takes any further action would render the utility of a decision remote for the same reason a judgment would not be conclusive." *Id.* If the Court were to "speculat[e] how the law would be enforced, [the Court] would leave parties to guess whether [the defendant] could take the same actions in a different matter." *Id.*

DraftKings' claim that the City's issuance of a subpoena is evidence of intent to enforce the Ordinance is unsupported by law. Pre-enforcement challenges to subpoenas that require court intervention for enforcement are not ripe. Courts evaluate whether a subpoena is "self-executing" by examining the authority pursuant to which it is issued. *First Choice*, 2024 WL 150096 at *3

(dismissing the plaintiff's request for a TRO and a preliminary injunction for lack of subject-matter jurisdiction sua sponte). The *First Choice* District Court explained that the New Jersey statutes that provided the authority for the challenged subpoenas required state "court intervention" in order to enforce them, and so they were not "self-executing." *Id.* Even when responding to a "broad administrative subpoena" would be "incredibly burdensome," a "non-self-executing subpoena" is not ripe for review. *Id.* (quoting *Google, Inc. v. Hood*, 822 F.3d 212, 216, 220, 228 (5th Cir. 2016)).

In *Google*, the Fifth Circuit "s[aw] no reason why a state's non-self-executing subpoena should be ripe for review when a federal equivalent would not be." 822 F.3d at 226. "If anything, comity should make [the federal court] less willing to intervene when there is no current consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court." *Id.* (citing *O'Keefe v. Chisholm*, 769 F.3d 936, 939-42 (7th Cir. 2014)). *See also CBA Pharma, Inc. v. Perry*, No. 22-5358, 2023 WL 129240, *3-4 (6th Cir. Jan. 9, 2023) (citing *Google* and finding that a pre-enforcement challenge to the validity of a state subpoena on the basis of preemption was not ripe); *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 695 (S.D.N.Y. 2018) (citing *Google* and agreeing that non-self-enforcing state subpoenas are "not legally distinguishable" from "the federal equivalent" for the ripeness inquiry, finding that Exxon had been compelled to comply, so the claim was ripe, but granting defendants' motions to dismiss on other grounds, including the failure to state a preemption claim). For these purposes, there is no legally significant distinction between the City's administrative subpoena and a state or federal administrative subpoena.

DraftKings' claims for declaratory and injunctive relief fail the *Step-Saver* test and are not ripe. There is no imminent harm to DraftKings. The City has not threatened any enforcement

action or found that DraftKings violated the law; the City has merely undertaken an investigation to determine *whether* DraftKings has violated the law. There is no current justiciable dispute between the parties regarding the City's legislative authority or whether the Ordinance is preempted because any future enforcement is purely hypothetical at this stage. The parties' interests are therefore not sufficiently adverse. And because further factual development is necessary—such as a determination that DraftKings violated the Ordinance and whether the violating conduct is covered by the Gaming Act at all, among other facts—a judgment now is not likely be conclusive. Finally, DraftKings does not identify any conduct it claims it wishes to engage in that would arguably violate the Ordinance but not the Gaming Act or the UTPCPL, so the judgment would have little utility. Put another way, DraftKings does not assert that it wishes to undertake prohibited unfair or deceptive practices in violation of the Ordinance such that the application of the law to the conduct can be evaluated and the legal challenges decided. At this premature stage, the Court would be made to speculate at how the Ordinance might be enforced. DraftKings' claims are not ripe and should be dismissed.

As a practical matter, DraftKings' suit is also a challenge to the subpoena itself. But "[a]gencies—and by extension, state officers . . .—are afforded latitude to conduct their investigations without interference and anticipatory jurisdictional challenges." *Exxon Mobil*, 316 F. Supp. 3d at 713. And federal courts "have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process." *Id.* (quoting *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001)). The City's subpoena is not self-executing. The subpoena expressly relies on three sources of authority, none of which confers a penalty for noncompliance and instead permits the City to seek enforcement in court. *See* Subpoena at 2-3 (citing Phila. Charter §§ 4-400(d) (providing investigative authority to the City's Law Department) & 8-409

(providing general subpoena authority to City's investigative agencies and officials and providing the process to secure compliance with subpoenas in the Court of Common Pleas of Philadelphia County); Phila. Code § 9-6303(1) (providing to the Law Department the authority to investigate Ordinance violation, including through subpoenas)). It also states that its purpose is to "gather facts to determine *whether* any violations of the Ordinance have occurred." Subpoena at 1 (emphasis added). The City may withdraw its subpoena at any time or it may lose in state court if DraftKings refuses to comply and the City must seek an order compelling compliance. Even if DraftKings complies or the City secures an order compelling compliance, the City may determine upon review of the records produced that DraftKings has not violated the Ordinance. And if the City finds that DraftKings has violated the Ordinance, it may decline to prosecute the violation for any number of reasons. The violating actions may or may not consist of conduct covered by the Gaming Act. Only if all of these contingencies occur could DraftKings possibly be subject to harm from the Ordinance. The chain of events is simply too attenuated to establish ripeness (or standing) for each of DraftKings' claims for declaratory and injunctive relief, and they should be dismissed for lack of jurisdiction.

### B. Each of DraftKings' Claims Also Fail on the Merits and Should Be Dismissed Pursuant to Rule 12(b)(6).

#### 1. The City of Philadelphia Holds Clear Authority to Enact the Ordinance, Warranting Dismissal of Count II.

Although the City's authority is challenged in Count II of the Complaint, which seeks a declaration that the City lacked authority under the First Class City Home Rule Act to enact the Ordinance, the City first addresses its clear authority to enact the Ordinance and demonstrate why DraftKings fails to state this claim. Under the First Class City Home Rule Act and well-established Pennsylvania law interpreting it, the City has broad authority to legislate and regulate

business activities within its jurisdiction. Because the Ordinance is not in conflict with the UTPCPL and the Gaming Act, as discussed in greater detail below, the Ordinance is within the City's authority under the First Class City Home Rule Act.

The principle of home rule power derives from the Pennsylvania Constitution, which provides that "[a] municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX § 2. The relevant question, then, is whether the Constitution, the City's Home Rule Charter, or any act of the General Assembly prohibits the City from enacting the Ordinance. Here, Plaintiffs assert that the General Assembly through legislation has denied the City the power to enact a local consumer protection law.

Specifically, Plaintiffs allege that the Ordinance exceeds the limits of authority conferred on the City by the Pennsylvania First Class City Home Rule Act, 53 P.S. § 13101, *et seq*. *See* Compl., ¶¶ 34-37, 85-90. Plaintiffs are wrong. The First Class City Home Rule Act implements the City's home rule authority, granting the City the power to legislate "to the full extent that the General Assembly may legislate" and to "enact ordinances, rules, and regulations necessary and proper for carrying into execution the foregoing powers." 53 P.S. § 13131. The First Class City Home Rule Act also provides that "no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . applicable in every part of the Commonwealth." 53 P.S. § 13133(b). Count II of the Complaint relies heavily on this provision, alleging that in in enacting the Ordinance, the City exercised powers "contrary to, or in limitation or enlargement of" the UTPCPL and the Gaming Act. *See* Compl., ¶¶ 34-37, 85-90 (ECF No. 1).

Plaintiffs' claim that the General Assembly has denied the City the power to enact local consumer protection legislation fails. As a threshold matter, Pennsylvania courts "presume that a home rule municipality's exercise of legislative power is valid," and "construe such power liberally, resolving any ambiguities relative thereto in the home rule municipality's favor." *Crawford v. Commonwealth*, 326 A.3d 850, 861 (Pa. 2024); *see also Nutter v. Dougherty*, 938 A.2d 401, 411 (Pa. 2007) (holding that courts must "begin with the view that [an exercise of home rule power] is valid absent a limitation found in the Constitution, the acts of the General Assembly, or the charter itself"). The Ordinance is also a remedial statute and must be "construed liberally to effect its object of preventing unfair or deceptive practices." *Monumental Props., Inc.*, 329 A.2d at 817.

In addition, the Pennsylvania Supreme Court has repeatedly and consistently interpreted Section 13133(b) of the First Class City Home Rule Act to mean that a local ordinance is negated only when the General Assembly has enacted a *conflicting* statute. *See Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132, 1144 (Pa. 2009) ("[L]ocal ordinances enacted pursuant to the local Charter are subordinate to the Home Rule Act when the matter at issue is one of statewide concern, and where the two conflict, then the subordination mandate of the Home Rule Act takes precedence and controls."); *Devlin v. City of Phila.*, 862 A.2d 1234, 1242 (Pa. 2004) ("With respect to this second limitation, this Court has explained that the General Assembly may negate ordinances enacted by home rule municipalities when the General Assembly has enacted a conflicting statute concerning 'substantive matters of statewide concern.'"); *Penn. Gaming Control Bd. v. City Council of Phila.*, 928 A.2d 1255, 1270 (Pa. 2007) (same).

Here, the Ordinance does not conflict with either the UTPCPL or the Gaming Act. *See* Sections B(2) and B(3), *infra*. Rather, the Ordinance complements and furthers the objectives of

the UTPCPL and the Gaming Act. *See id.* Accordingly, Count II fails to state a claim and should be dismissed pursuant to Rule 12(b)(6).

**2. The Ordinance Does Not Conflict with the UTPCPL, and Consequently is Not Preempted by That Statute**

Count I of the Complaint asserts that the Ordinance is invalid and unenforceable because it conflicts with the UTPCPL, such that the UTPCPL preempts the Ordinance. DraftKings' conflict preemption claim fails as a matter of law because there is no conflict between the laws.

Under well-established Pennsylvania law, conflict preemption requires actual, material, and irreconcilable conflict. *Hoffman Min. Co. v. Zoning Hearing Bd. of Adams Tp.*, 32 A.3d 587, 594 (Pa. 2011). It applies only "when simultaneous compliance with both the local ordinance and the state statute is *impossible*." *Id.* (emphasis added); *see also Warren v. City of Philadelphia*, 115 A.2d 218, 221 (Pa. 1955) (even if a state statute and a municipal ordinance legislate the same subjects, they are upheld if not in conflict). The core question is whether a commercial actor can conceivably comply with both the Ordinance and UTPCPL simultaneously. Here, the answer is unequivocally yes.

DraftKings accurately alleges that the Ordinance is nearly identical to the UTPCPL with respect to the conduct that it regulates. Compl., ¶ 26 (ECF No. 1). Given this concession, there can be no conflict preemption under Pennsylvania law. Conduct that is deceptive under one law is deceptive under the other. The inquiry should stop there; no irreconcilable conflict exists. *See, e.g., Hoffman*, 32 A.3d at 603-07 (finding no conflict preemption where one could comply with both local and state setbacks, even though the setbacks were different).

Unable to show that compliance with both the Ordinance and the UTPCPL is untenable, DraftKings instead points to remedial differences between the two laws. But differences in the availability and value of remedies are downstream of a regulated actor's ability to comply with

both laws and only arise *after* a party has engaged in prohibited conduct, which, again, is substantively the same under both laws. Such differences therefore have no bearing on the regulated party's ability to conform its conduct to both laws in the first instance and are irrelevant to the conflict preemption analysis.

To the extent DraftKings speculates about overlapping enforcement and recovery by the City and Commonwealth, that is a case-management or remedies issue, not a preemption issue. Courts routinely manage overlapping claims, duplicative recovery concerns, and questions of monetary allocation. *See Commonwealth by & through Krasner v. Att'y Gen*., 309 A.3d 265 (Pa. Commw. Ct. 2024) (explaining that where both the Attorney General and the District Attorney bring concurrent UTPCPL enforcement actions for the same conduct and a conflict in representation arises, the Attorney General takes priority in civil matters). Questions about hypothetical remedial coordination do not affect an individual's ability to comply with both laws. Nor are such questions relevant here, where the Commonwealth has not brought its own action for the same conduct, and no coordination issue exists.

Nor does the Ordinance's retroactivity provision constitute irreconcilable conflict, because it only reaches conduct that was already prohibited by the UTPCPL. The Ordinance therefore imposes no new substantive retroactive duties. Instead, it merely provides a local enforcement mechanism for conduct already unlawful under state law—underscoring that the Ordinance complements, rather than conflicts with, the UTPCPL.

Finally, although the Ordinance's remedial scheme differs from the UTPCPL's, that difference does not support the relief that DraftKings seeks in Count I—a declaratory judgment that the Ordinance is invalid and unenforceable in its entirety under conflict preemption principles. Whatever becomes of the Ordinance's remedial provisions in a case with parallel

state enforcement, that question is distinct from whether the Ordinance's prohibition of deceptive conduct is preempted, and the two rise and fall independently.

Municipalities may adopt "additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality which are not in themselves unreasonable." *Mars Emergency Medical Srvs., Inc. v. Township of Adams*, 740 A.2d 193, 195 (Pa. 1999) (quoting *Western Pennsylvania Restaurant Association*, 77 A.2d at 620). This is precisely what the Ordinance does. Just as the UTPCPL gives the Attorney General public enforcement authority to address deceptive practices in the Commonwealth, the Ordinance gives Philadelphia a local public enforcement mechanism to address deceptive practices that affect consumers and municipal operations in Philadelphia. This should come as no surprise, as local laws regularly advance objectives originally set forth in state laws. *See, e.g., Hartman v. City of Allentown,* 880 A.2d 737, 751 (Pa. Commw. Ct. 2005) (holding that local anti-discrimination ordinance prohibiting sexual orientation and gender identity discrimination was not preempted by Pennsylvania Human Relations Act, 43 P.S. §§ 951–963); *Wolfe v. Township of Salisbury,* 880 A.2d 62, 68-69 (Pa. Commw. Ct. 2005) (finding that ordinance permitting hunting in township park recreation areas not preempted by the state Game Law, Act of June 3, 1937, P.L. 1225); *Sunny Farms, Ltd. v. North Codorus Township,* 474 A.2d 56, 59 (Pa. Commw. Ct. 1984) (holding that state regulation prohibiting dumping of solid waste within 25 feet of the perimeter property line did not preempt a local zoning ordinance imposing 500–yard setback requirement on hazardous waste dumps). Such parallel local laws are not preempted. *See Holt's Cigar*, 10 A.3d at 907*; Mars Emerg.*, 740 A.2d 193, 195 (Pa. 1999); *Western Pennsylvania*, 77 A.2d at 616-20.

The Ordinance is designed to operate harmoniously with the UTPCPL and to achieve the complementary objective of protecting Philadelphia consumers from unfair and deceptive trade practices. Because the laws do not conflict and because the Ordinance does not stand as an obstacle to the objectives of the UTPCPL, conflict preemption does not apply. Count I should be dismissed for failure to state a claim.

**3. The Gaming Law Does Not Occupy the Field of Deceptive Marketing and Its Express Preemption Provision Does Not Reach the Substantive Content of Advertisements or Promotions.**

DraftKings' claim that the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act") occupies the field of "licensed gaming activities" and, in the alternative, expressly preempts the Ordinance, is incorrect as a matter of law. The Gaming Act regulates licensing and operation of gambling businesses in Pennsylvania and created the Gaming Control Board. The Gaming Control Board, in turn, issues licenses to gambling businesses and maintains technical standards for gaming devices. But the only intersection between the Gaming Act and the general concept of marketing or promotion by gambling operators is that the Gaming Act requires certain "responsible gambling" messages and bars solicitation to suspended or self-excluded accounts. The Gaming Act does not touch upon—let alone occupy—the field of unfair or deceptive marketing. And while the Gaming Act does contain a limited express preemption provision addressing location of gambling facilities, that provision does not operate as a general bar to local regulation of covered entities in other areas. DraftKings' claims that the City's Ordinance is preempted by the Gaming Act—under either a field or express preemption theory—thus fail and should be dismissed.

a. <u>The Gaming Act Does Not Occupy the Field of Unfair or Deceptive Practices.</u>

DraftKings' claim in Count III that the Ordinance is preempted by the Gaming Act because the Gaming Act occupies the field of gambling regulation fails as a matter of law. Field preemption applies under Pennsylvania law where a statute, even if silent on express supersession, "proclaims a course of regulation and control which brooks no municipal intervention." *Dep't of Licenses & Inspections v. Weber*, 147 A.2d 326, 327 (Pa. 1959). Pennsylvania courts have given that standard concrete content: field preemption applies only where the state has imposed "a pervasive regulation of **every aspect of an industry or profession**." *Mid-Atl. Sys. of WPA, Inc. v. Tax Office of Mun. of Monroeville*, 204 A.3d 579, 587 (Pa. Commw. Ct. 2019) (quoting *Rose View Manor, Inc. v. City of Williamsport*, 630 A.2d 474, 477 (Pa. Commw. Ct. 1993) (emphasis added in *Mid-Atl.*)). Therefore, field preemption "is the exception," applying only where "the legislature must manifest its intent entirely to preempt th[e] field," and "does not result simply because the General Assembly legislates in the field." *Mid-Atl. Sys.*, 204 A.3d at 587 (quoting *Nutter*, 938 A.2d at 406). Indeed, where an act is "silent as to monopolistic domination and a municipal ordinance provides for a localized procedure […], the ordinance is welcomed as an ally, bringing reinforcements into the field of attainment of the statute's objectives." *Weber*, 147 A.2d at 327. The only areas where field preemption has been recognized are alcoholic beverages, anthracite mining, public utilities, and banking. *Nutter*, 938 A.2d at 414. And even where a field has been preempted, the "field" must be adequately defined. For example, while the Commonwealth has preempted the field of public utility regulation, the "field" is defined as matters within the jurisdiction of the Public Utility Commission—the "complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities." *PPL Elec. Utils. Corp. v.*

*City of Lancaster*, 214 A.3d 639, 650 (Pa. 2019) (citing *Einhorn v. Phila. Elec. Co.*, 190 A.2d 569 (Pa. 1963)).

Measured against that standard, DraftKings' field preemption theory fails on the face of the Complaint. *See* Compl., ¶¶ 94–98. DraftKings grounds its "occup[ies] the field" assertion in the Gaming Board's general licensing authority and the existence of the Bureau of Investigations and Enforcement, not in a specific regulation reaching general advertising or disclosure conduct. Compl., ¶ 94. DraftKings' assertion that an enforcement action "would necessarily implicate" licensed activities, Compl., ¶ 97, fails to identify *which* Gaming Act provision the Ordinance actually implicates. And it recites a list of subject matter categories—advertising, marketing, customer communications, user data analytics, account management—without connecting any of them to a regulation that governs them. Compl., ¶ 98. These legal conclusions couched as factual allegations receive no presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Furthermore, closer examination of the Gaming Act wholly undermines DraftKings' argument.

The Gaming Act regulates the licensing and operation of gambling in Pennsylvania. The Gaming Act creates the Gaming Control Board and grants it "general and sole regulatory authority over the conduct of gaming and related activities as described in this part." 4 Pa. C.S. § 1202(a)(1). "This part" covers licensing and technical standards for gaming devices, 4 Pa. C.S. §§ 1201, 1207, 13B41; tax and revenue reporting, 4 Pa. C.S. §§ 13B52, 13C62, 1211; and a defined set of player protection measures aimed at problem gambling, including mandatory helpline disclosures, wager and loss limits, and self-exclusion, 4 Pa. C.S. §§ 1509, 1516; 58 Pa. Code §§ 501a.7, 813a.1.

The Act, including the specified "part," does *not* regulate the truthfulness of a licensee's advertising, the clarity of its promotional terms, or the adequacy of its disclosures to consumers generally, all of which are encompassed by the Ordinance's catchall provision. The rules issued by the Gaming Control Board illustrate the scope of the Gaming Act's purview. Where the Gaming Control Board's rules touch advertising at all, they require a specific "responsible gambling" message and bar solicitation of suspended or self-excluded accounts. The Gaming Control Board does not review promotional content for accuracy or fairness. While the Gaming Control Board may regulate licensed gaming generally, it does not regulate all aspects of a licensee's general business practices. Indeed, the "field" of licensing, technical specifications for gambling devices, reporting, accounting, and "responsible gambling" messaging for gambling licensees does not extend to unfair or deceptive marketing and promotional materials. This regime is a far cry from the "clear legislative intent to exercise complete control over all aspects of liquor manufacture, sale and use," the "clear intent to preempt local legislation in the anthracite mining industry," or the "commercial necessity" that "presents a special need for uniformity" in banking. *Mars*, 740 A.2d at 195-96 (citations omitted).

Because the Gaming Act does not occupy the "field" of unfair or deceptive practices, it does not preempt the Ordinance.

b. Part II of the Gaming Act Regulates a Narrow Area of Marketing, Targeting a Set of Player Protection Standards.

Part II of the Gaming Act's advertising and disclosure provisions share a common design: each protects a defined, already-vulnerable population of players through a specific, narrow mechanism, and neither imposes a general "truth in advertising" or disclosure standard that would preclude additional regulation under the Ordinance.

The Act requires a specified helpline message, or approved equivalent, and account-level

loss and wager limit tools. 4 Pa. C.S. § 1509. It also prohibits a licensee from sending promotional material to a player whose account is suspended or who has opted out. 4 Pa. C.S. §§ 1509, 1516. The content or accuracy of promotional messaging sent to active accounts falls outside the regulation of the statute.

The Gaming Control Board's regulations, in turn, require the same helpline message in advertisements, with placement and sizing specifications, and requires interactive operators to submit promotions with an employee's attestation of "compliance with Board regulations." 58 Pa. Code §§ 501a.5, 813a.1-5. Compliance with Board regulations means compliance with the Board's own checklist: present the helpline message, size it correctly, and confirm self-exclusion controls are functioning. The Complaint's characterization of this regulatory chapter as covering "every aspect" of advertising, Compl., ¶ 49, describes the checklist's existence rather than its content. In reality, the regulations supply procedural coverage for the mechanisms of obtaining Board signoff for compliance with its narrow requirements. The regulations do not provide substantive oversight into whether a promotion is honest, fair, or otherwise misleading. Neither the Act nor the Gaming Board Regulations regulate general truth in advertising standards, nor do they require clarity of bonus terms and promotions or reviewing promotional terms for accuracy.

Likewise, the Gaming Control Board's account funding regulations govern how promotional and bonus credits move through a player's account ledger, listing cash complimentaries, promotional credits, and bonus credits as permitted funding methods subject to the operator's own terms of service. 58 Pa. Code § 812a.7. These are accounting and internal control provisions. They do not substantively determine how credits are marketed or what must be disclosed about them, and they do not establish what requirements, if any, an operator's terms of service must satisfy. Other provisions also provide accounting and reporting requirements for

tax purposes. *E.g.*, 4 Pa. C.S. § 13B52 (Interactive Gaming Tax); *id.* § 13C62 (Sports Wagering Tax); *id.* § 1211 (Gaming Control Board's reporting obligations).

Finally, DraftKings asserts that the Gaming Control Board has exclusive enforcement authority over regulated entities. Compl., ¶¶ 51-52, 54. But it can and does only investigate violations of the gaming regulations discussed *supra*—e.g., accounting and "responsible gambling" messaging—not whether DraftKings or any other regulated entity is engaged in unfair or deceptive marketing or promotion in violation of the Ordinance (or the UTPCPL). *See* 4 Pa. C.S. § 1201, 1202 (establishing the Board and providing it with regulatory authority over "the conduct of gaming or related activities" and to "issue, approve, renew, revoke, suspend, condition or deny [the] issuance or renewal of slot machine licenses."). And the stated legislative intent of the Gaming Act, *see* Compl., ¶ 45, has no preemptive effect itself. *See* 4 Pa. C.S. § 1102 (expressing an intent to "protect the public through regulation and policing of all activities involving gaming and practices that continue to be unlawful," with no reference to false or misleading marketing).

c. <u>The Gaming Act Expressly Preempts Limited, Specific Local Regulation and Does Not Broadly Preempt Local Regulation of Licensees' Sales and Marketing Activity.</u>

While the Gaming Act has been found to preempt local authority with respect to locating licensed facilities, that provision has been narrowly construed by Pennsylvania courts. *See* 4. Pa. C.S. § 1304(b)(1) (providing that certain licensed facilities "shall be located by the board within a city of the first class"). The Gaming Act's provisions relating to approving the location of a licensees' business preempt a local attempt to undo the Gaming Control Board's siting process. *Pa. Gaming Control Bd. v. City Council of Philadelphia*, 928 A.2d 1255, 1258, 1266 (Pa. 2007). DraftKings overreads the case, *see* Compl., ¶ 43, arguing that "the Gaming Act is a 'statute of

statewide concern,'" *id.* (quoting *Gaming Control Bd.*, 928 A.2d at 1258), and so preempts the field. But the only issue in that case was the location of two licensees' businesses in Philadelphia and the Court emphasized that the proposed ordinance would "permit[] that which the Gaming Act forbids" creating a "conflict" with the location selection provisions of the Act that grant the Gaming Control Board certain powers. *Gaming Control Bd.*, 928 A.2d at 1269-70. At bottom, *Gaming Control Board* is a narrow, conflict preemption case regarding a specific dispute among the Gaming Board, licensees, and the City Council of Philadelphia regarding the location of the licensees and the City's zoning authority after the licenses had been granted.

The Gaming Act's core licensing and device certification functions ensure consistent operation throughout the Commonwealth but they do not reach all aspects of conducting a licensee's business. Certification of a slot machine's random number generator may benefit from a single statewide answer, for example, to protect gamblers and to set clear rules for licensees. Advertising and promotional practices toward Philadelphia consumers, on the other hand, are not covered by the Act or its regulations, and there is no interconnected infrastructure nor technical standard that would function incoherently if consumer protection standards were applied locally.

A New Jersey appellate court's decision in a case challenging an analogous consumer protection case against a casino illustrates these points. That court held that the N.J. Casino Control Commission's advertising jurisdiction did not preempt a Consumer Fraud Act claim because the challenged advertising involved "nothing highly sophisticated or technical" and made no "reference . . . to the heavily regulated rules of the game or gaming equipment," making it "similar in type to those ads used to entice patronage of any other business." *Smerling v. Harrah's Entertainment, Inc.*, 912 A.2d 168, 192 (N.J. Super. Ct. App. Div. 2006). Tellingly, DraftKings does not argue that it is exempt from the UTPCPL because of the Gaming Act.

DraftKings' promotions, as described in the Subpoena, are the same kinds of advertising as any other business. Bonus offers and account credits sit well apart from wagering rules and gaming equipment regulations under the Gaming Act.

In sum, the Gaming Act governs the licensing and core gaming activities of casinos, vesting the Gaming Control Board with sole authority over enforcement of its regulatory provisions. Covered areas include the functioning of gambling devices, accounting, reporting, and including a required "responsible gambling" message with its advertising. The content of marketing and promotional materials—and whether they mislead Philadelphia consumers—are not regulated by the Gaming Act in any manner. The Gaming Act does not occupy the field of unfair or deceptive business practices, nor does it conflict with the Ordinance. Consequently, the Ordinance is not preempted by the Gaming Act under any theory of preemption, and Count III should be dismissed.

## V. CONCLUSION

For all the foregoing reasons, the City of Philadelphia respectfully requests that the Court dismiss DraftKings' Complaint for lack of jurisdiction or with prejudice for failure to state a claim and grant any further relief the Court deems just and proper.

Dated: September 15, 2026 Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
MONIQUE MYATT GALLOWAY, ACTING CITY SOLICITOR

BY: *__/s/ Ryan B. Smith__*
Lydia Furst
Chief Deputy City Solicitor
Pa. Bar No. 307450
Ryan B. Smith
Divisional Deputy City Solicitor
Pa. Bar No. 324643
Cherriel Gentles

Senior Attorney
Pa. Bar No. 87081
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Defendant the City of Philadelphia*